[No. A050447. First Dist., Div. Two. May 20, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
THOMAS HOUSLEY, Defendant and Appellant.

[Opinion certified for partial publication.*]

*Pursuant to California Rules of Court, rules 976 and 976.1, this opinion is certified for publication with the exception of parts B-G of the Discussion.

COUNSEL

Stephen B. Bedrick, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, John Sugiyama, Assistant Attorney General, Mark S. Howell and Joan Killeen Haller, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

KLINE, P. J.—Appellant Thomas Housley appeals following his conviction of two counts of rape (Pen. Code, § 261, subd. (a)(2)) and five counts of rape by a foreign object (Pen. Code, § 289, subd. (a).) He contends his convictions must be reversed or, at a minimum, his case remanded for resentencing, for the following reasons: (1) the court improperly allowed a psychologist to offer expert testimony regarding the typical conduct of molestation victims and then failed to properly limit the use of the evidence; (2) the court erred in permitting the use of hearsay evidence and evidence of past bad acts; (3) he received inadequate notice of the basis of the foreign object rape charges; (4) his right to a unanimous verdict was violated; (5) there was insufficient evidence of penetration to support the two rape charges; (6) his eighteen-year sentence constitutes cruel and unusual punishment; and (7) the court erred in imposing consecutive sentences, and failed to provide adequate reasons for its sentencing choices. We affirm, but remand for resentencing.

STATEMENT OF THE CASE

On June 16, 1989, appellant was charged by complaint with two counts of rape (Pen. Code, § 261, subd. (a)(2)) and two counts of rape with a foreign object. (Pen. Code, § 289, subd. (a).)

Following a preliminary hearing an information was filed on August 29, 1989, charging appellant with two counts of rape and six counts of foreign object rape. Appellant moved to set aside the information, arguing there was insufficient evidence to support the additional charges of foreign object rape. The motion was denied.

Trial commenced on May 2, 1990. On May 8 the jury convicted appellant of two counts of rape and five counts of foreign object rape, and acquitted appellant of one count of foreign object rape. On June 25, 1989, appellant moved for a new trial, which was denied.

On July 18 appellant was sentenced to eighteen years in prison, calculated as follows: a six-year midterm for count 1, rape; a full consecutive six-year term pursuant to Penal Code section 667.6, subdivision (c) for count 2, rape; a full, consecutive six-year term pursuant to Penal Code section 667.6, subdivision (d) on count 3, foreign object rape; and concurrent six-year terms on the four remaining counts of foreign object rape.

This timely appeal followed.

## STATEMENT OF THE FACTS

Appellant's granddaughter Maryella was 18 at the time of the trial. Due to a hearing disability she testified through a sign language interpreter[1] and recanted her previously asserted claim that her grandfather, appellant, had sexually molested her.

Maryella testified she reported appellant had molested her in April 1989 while she was living in her grandparents' home in Richmond. In June 1989 she went to live at her cousin Dolores's house and complained she did not want to live with appellant anymore because he was harassing her about "opening [her] up." Maryella told her cousin she was afraid of her grandfather.

Maryella admitted she spoke with Detective Anderson and told him appellant made her watch pornographic movies to "educate her." She told him her grandfather had read to her from the Bible and encouraged her to have sex with him based on passages in the Bible. Appellant also told Maryella she had to have sex with him to prepare herself to have sex with boys.

Maryella acknowledged she previously testified her grandfather exposed his penis and asked her to touch it. She also admitted she testified that one night in April appellant asked her to pull down her shorts and inserted his finger in her vagina. This incident lasted 15 to 20 minutes. Appellant then took her into the garage, had her lean over onto his car, fondled her breasts and inserted his finger, a "rubber dick," and his penis. When he was done appellant told Maryella to pull up her pants and not to tell anyone about what had happened. At the preliminary hearing Maryella testified appellant warned that if she didn't let him "open her up" he would whip her.

Maryella repeated these claims to police officers, social workers and the prosecutor during the 11 months preceding the trial; however, at trial she

---

[1] Although Maryella is able to read lips she requested an interpreter at trial to insure she did not miss any of the proceedings.

testified that none of these events occurred, and that she had made up the whole story so she could leave her grandfather's home and have more freedom.

Maryella's cousin Dolores Thomas testified that Maryella arrived at her house on June 3, 1989. Maryella was upset and crying, and told Dolores appellant was pressuring her to have sex with him. Maryella told Dolores that on the night of her uncle's birthday appellant had sat next to her on the couch and inserted his finger into her vagina. Appellant then took Maryella into the garage and told her to pull her shorts down and bend over the car. He inserted a rubber penis, then inserted his own penis and "moved it around." He then inserted the rubber penis again, and then re-inserted his own penis. Maryella reported she felt disgusted when she felt the "white stuff" running down her legs. Maryella told her cousin she had tried unsuccessfully to wake her grandmother, who had been drinking.

Dolores testified that since the time Maryella first told her of this incident she has repeated it many times and has always been consistent about what happened. Maryella expressed concern about her younger sister (who had been removed from appellant's home after Maryella's molestation report) and stated, " 'at least my little sister is safe. I won't have to worry about this happening to her.' " According to Dolores, the family was pressuring Maryella to retract her story. Dolores stated that on one occasion Maryella's mother told Maryella she was the cause of her grandfather going to jail and that he would only be released if Maryella said she had made up the molestation story.

Dr. Theresa Schuman was accepted as an expert in psychology and testified regarding the problems facing young adults who have been sexually abused. She stated she was not Maryella's therapist, and had never met her. She testified, over defense objection, that it is uncommon for victims of sexual abuse to immediately report the abuse. Dr. Schuman explained that victims delay reporting the abuse because it forces them to relive the trauma of the abuse and cements in their mind the fact that the abuse actually happened. She further stated that it is very common for victims of abuse to recant the story after first making a report because they may not be believed, or may be removed from their home, or may fear the offender will suffer negative consequences from the reported abuse. In addition, according to Dr. Schuman, victims of intrafamily abuse are more likely to recant than those who suffer abuse at the hands of a stranger, since they suffer more pressure and guilt in making the report.

Dr. Edward Connolly testified as an expert in the area of physical findings in sexual abuse cases. He stated that he examined Maryella for signs of

abuse and found the vaginal opening to be larger than would be expected. He opined that the size of the opening suggested she had been penetrated by a "fairly substantial size object over a prolonged period of time."

Lydia Cass, a social worker for child protective services, went to Dolores Thomas's home on June 5, 1989, to speak with Maryella. She testified that Maryella appeared "very nervous," "agitated," and "weepy at times." At the time they spoke Maryella was very concerned that after she reported the abuse her family would not love her. Maryella also told her she did not want her grandfather to go to jail. Maryella told Ms. Cass appellant wanted to "open her up" so she could be with her boyfriend, and that appellant had shown her pornographic movies in their home. Maryella also reported her mother told her to keep a box of Kotex near her bed, so it would look as though she was menstruating, and her grandfather would not bother her.

Penny James was a social worker who worked for child welfare services and was assigned to Maryella in June 1989. Maryella described to her the molestations that occurred during April 1989 and told Ms. James her mother advised her to keep Kotex near her bed to dissuade appellant's sexual advances. After a juvenile court hearing was held to determine where Maryella and her sister would live Maryella became hysterical about the fact that she had lost her relationship with her mother. Ms. James testified that Maryella was hurt by the loss of her family's support and stated, "they don't believe me, why don't they believe me, I'll just give up."

Officer Joseph Anderson of the Richmond Police Department also interviewed Maryella regarding her claim of molestation. Maryella told him appellant had recited passages from the Bible and had shown her pornographic movies to induce her to allow him to have intercourse with her. Maryella specifically told Officer Anderson that on her uncle's birthday appellant had inserted his finger and a "rubber penis" into her vagina. He also attempted intercourse with his own penis, but Maryella was uncertain if he actually penetrated her vagina.

Officer Anderson testified he executed a search warrant at appellant's residence. When appellant was informed of the search he spontaneously said, " 'I was only trying to teach her about the bible.' " During the search the officers discovered two Bibles and four pornographic movies in the house and found rubber dildos in appellant's car. On cross-examination the officer acknowledged that Maryella did not tell him about the incident on the couch, but only recounted the molestations in the garage.

Ethel Brotten worked as a court-appointed representative for abused children and handled Maryella's case since October 1989. She testified that

Maryella was afraid she would be rejected by her family if she testified against her grandfather. A couple of months before trial Maryella called Ms. Brotten and was crying. Maryella complained that she was tired and stated, " 'I don't know if I can go through too much more of this.' "

Suzanne Adelson, a social worker for the department of social services, was assigned to handle Maryella's case in September 1989. She testified that Maryella wanted to be with her mother, but was unwilling to live with her mother if her grandfather was to be with them. During a March hearing Maryella requested, and was granted, an unsupervised visit with her mother. When Ms. Adelson next saw Maryella, a day or two after the visit, Maryella claimed that she had lied about the molestations and stated, " 'since I'm not going to press charges, [ ] there won't be a trial.' "

Appellant did not present any defense witnesses.

## DISCUSSION

### A. *Psychologist's Opinion Testimony*

 Appellant first asserts the court erred in permitting Dr. Schuman to testify over objection concerning behavior common to sexual abuse victims. In particular, appellant argues it was error to allow the doctor to testify that victims commonly and falsely recant their stories of abuse, and often tell conflicting versions of a true story of abuse. According to appellant, the use of this evidence was improper because (1) the doctor had not met Maryella, and had no basis for giving an opinion on her credibility, (2) it violated the rule that psychological "syndrome" testimony may not be used to suggest a crime occurred simply because the alleged victim exhibits symptoms common to victims of that crime, and (3) such psychological testimony cannot affirmatively be used by the prosecution, but may only be used to rebut a defendant's attack on the victim's credibility.

First, appellant is mistaken in asserting Dr. Schuman improperly rendered an opinion on Maryella's credibility. Dr. Schuman plainly testified she had never met Maryella, was unfamiliar with the details of the case and had never read any reports associated with this matter. This testimony made clear the fact that the doctor was merely explaining behavior common to sexual abuse victims, and was not offering an opinion on Maryella's credibility.

We also disagree with appellant's claim that the doctor's testimony was improperly used to suggest the molestations actually occurred. In *People* v. *Bledsoe* (1984) 36 Cal.3d 236 [203 Cal.Rptr. 450, 681 P.2d 291]

our Supreme Court concluded that under the *Kelly-Frye*[2] standard, psychological evidence based on the "rape trauma syndrome" could not be used to show a rape actually occurred, but was admissible to "disabus[e] the jury of some widely held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths." (36 Cal.3d at pp. 247-248.)

In *People* v. *Bowker* (1988) 203 Cal.App.3d 385 [249 Cal.Rptr. 886] this reasoning was extended to the use of testimony concerning child sexual abuse accommodation syndrome (CSAAS). There, the court relied on *Bledsoe* and declared that while testimony concerning the common psychological effects of child abuse could not be used as a predictor of child abuse, it may—with certain limitations—be used to disabuse the jury of common misconceptions concerning abuse victims. (203 Cal.App.3d at pp. 391-394.) First, the CSAAS evidence must be addressed to a specific "myth" or "misconception" suggested by the evidence. (203 Cal.App.3d at p. 394.) Second, "if requested the jury must be admonished 'that the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true. . . . The evidence is admissible *solely* for the purpose of showing that the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested.' " (*People* v. *Sanchez* (1989) 208 Cal.App.3d 721, 735 [256 Cal.Rptr. 446], quoting *Bowker, supra,* at p. 394, italics in original; see *People* v. *Stark* (1989) 213 Cal.App.3d 107, 116 [261 Cal.Rptr. 479], *People* v. *Bothuel* (1988) 205 Cal.App.3d 581, 587-588 [252 Cal.Rptr. 596]; cf. *People* v. *McAlpin* (1991) 53 Cal.3d 1289 [283 Cal.Rptr. 382, 812 P.2d 563] [applying rule to victim's parent's failure to report molestation].)

In this case Dr. Schuman's testimony was clearly intended to help explain Maryella's delay in reporting the abuse and her last-minute recantation of the charges. Under these circumstances expert psychological testimony may be used to aid the jury's assessment of the victim's behavior. (*People* v. *Bowker, supra,* 203 Cal.App.3d at p. 394.) Contrary to appellant's position, the doctor did not suggest Maryella's claims were credible simply because she exhibited some behaviors common to abuse victims. The doctor advised the jury, both during her direct examination and again during her cross-examination that she had never met Maryella and was unfamiliar with the particulars of the case. It is thus unlikely the jury would interpret her

---

[2]In *People* v. *Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240] our Supreme Court adopted the rule of *Frye* v. *United States* (D.C. Cir. 1923) 293 Fed. 1013 [54 App.D.C. 46. 34 A.L.R. 145] regarding the use of new scientific methods of proof. Under this standard a new scientific technique employed by an expert must " 'be sufficiently established to have gained general acceptance in the particular field in which it belongs.' " (*Kelly* at p. 30, quoting *Frye, supra,* at p. 1014, italics omitted.)

statements as a testimonial to Maryella's credibility. On this record we are satisfied the psychological testimony was properly used to dispel certain common misconceptions regarding the behavior of abuse victims.

This sort of psychological testimony commonly is used after the defense has directly challenged the victim's credibility by asserting his or her behavior was inconsistent with the claimed abuse. As a result, cases sometimes suggest that expert testimony only may be used to rebut defense attacks on the victim's credibility. (*People* v. *Bowker, supra,* at p. 394; *People* v. *Harlan* (1990) 222 Cal.App.3d 439, 449 [271 Cal.Rptr. 653].) Relying on these cases, appellant argues the court erred in permitting the prosecution to introduce Dr. Schuman's testimony in its case-in-chief before the defense attacked Maryella's credibility.

At trial Maryella recanted her previous claims of abuse and asserted she had been lying; appellant thus had no reason to challenge her trial testimony. However, before Dr. Schuman testified the defense cross-examined Maryella concerning letters she had written, her prior sexual experience and her relationship with her family. While the cross-examination was not intended to attack her *trial* testimony, which was favorable to appellant, it clearly was intended to cast doubt on both her preliminary hearing testimony and her prior statements to relatives, police officers and social workers. Furthermore, Maryella directly placed her credibility in issue by retracting her molestation claims and offering a new story at trial. Under these circumstances the psychological testimony was properly admitted to rehabilitate Maryella's credibility and to explain the pressures that sometimes cause molestation victims to falsely recant their claims of abuse. (*People* v. *Sanchez, supra,* at pp. 735-736 [rehabilitative testimony properly admitted during prosecution's case-in-chief where victim's credibility was attacked on cross-examination]; *People* v. *Bergschneider* (1989) 211 Cal.App.3d 144 [259 Cal.Rptr. 219] [prosecutor not limited to using such testimony on rebuttal].)

■ Finally, appellant complains the court failed to instruct the jury that the CSAAS testimony could not be used to determine if the molestation claim was true, but could only be used to show the victim's conduct was not inconsistent with having been abused. Appellant maintains this sort of expert testimony, if misinterpreted as support for the victim's claims, is so potentially damaging to a defendant that it must be considered "closely and openly connected with the evidence and the fate of the defendant" so as to require a sua sponte limiting instruction. He further asserts it is inconsistent to require an instruction on the proper weight to be given to such expert testimony (see Pen. Code, § 1127b) without requiring an admonition on the limited purpose for which it may be considered. We find appellant's arguments persuasive, and thus conclude that when testimony concerning CSAAS is admitted, the

court must sua sponte instruct the jury that this evidence should not be used to determine if the victim's claims are true.

It is well settled that expert testimony concerning CSAAS only may be used to disabuse the jury of commonly held misconceptions regarding the behavior of abuse victims, and may not be used to corroborate the victim's claims of abuse. (*People* v. *Bowker, supra,* 203 Cal.App.3d at p. 394.) However, there is some disagreement concerning whether the defendant is entitled to a sua sponte instruction specifically limiting the use of this evidence. In *People* v. *Bowker, supra,* the court concluded "the jury must be instructed simply and directly that the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true." (203 Cal.App.3d at p. 394.)[3] Some subsequent cases have interpreted *Bowker* to require an instruction only where one is requested. (*People* v. *Bothuel, supra,* 205 Cal.App.3d at pp. 587-588; *People* v. *Sanchez, supra,* 208 Cal.App.3d 721, 735; *People* v. *Stark, supra,* 213 Cal.App.3d 107, 116.) Appellant failed to request any limiting instruction at trial and now contends the court should have admonished the jury sua sponte.

■ Generally, "absent a request by a party, there is no duty to give an instruction limiting the purpose for which evidence may be considered." (*People* v. *Nudd* (1974) 12 Cal.3d 204, 209 [115 Cal.Rptr. 372, 524 P.2d 844], overruled on a different issue in *People* v. *Disbrow* (1976) 16 Cal.3d 101, 113 [127 Cal.Rptr. 360, 545 P.2d 272]; see also Evid. Code, § 355.) However, a trial court is obligated to give sua sponte instructions regarding the "general principles of law relevant to the issues raised by the evidence." (*People* v. *St. Martin* (1970) 1 Cal.3d 524, 531 [83 Cal.Rptr. 166, 463 P.2d 390].) ■ The court is also required to instruct the jury sua sponte on the weight to be given expert testimony. (Pen. Code, § 1127b.)

Because juries may accord undue weight to an expert's opinion, special care must be taken to insure the jury understands its duty to independently assess the expert opinion along with and in light of all other relevant evidence. In *People* v. *Bledsoe, supra,* 36 Cal.3d at pages 247-248, our Supreme Court determined that expert testimony concerning rape trauma syndrome could not be used to prove a rape actually occurred because " '[p]ermitting a person in a the role of an expert to suggest that because the complainant exhibits some of the symptoms of rape trauma syndrome, the victim was therefore raped, unfairly prejudices the appellant by creating an

---

[3]At oral argument and in his subsequent letter brief appellant asserted the court in *People* v. *Renfro* \*(Cal.App.) had imposed a duty to give a sua sponte instruction regarding the limited use of CSAAS testimony. *Renfro* has since been depublished by our Supreme Court and thus may not be used as support for appellant's argument.

\*Reporter's Note: *People* v. *Renfro* (C008507) deleted upon direction of Supreme Court by order dated April 23, 1992.

aura of special reliability and trustworthiness.' " (*Id.*, at p. 251.) Other courts and commentators also have recognized that expert testimony may require special treatment because jurors may too readily accept expert or scientific evidence that is beyond their expertise. (*People* v. *Reeder* (1976) 65 Cal.App.3d 235, 242 [135 Cal.Rptr. 421] [noting that scientific proof " 'may in some instances assume a posture of mystic infallibility in the eyes of a jury of laymen' "]; *People* v. *Malgren* (1983) 139 Cal.App.3d 234, 241-242 [188 Cal.Rptr. 569] [special instructions needed to assess dog tracking evidence because the jury may give the evidence too much weight]; Carter, *Testimony in Child Sexual Abuse Cases* (1989) 22 Loyola L.A. L.Rev. 1103, 1146, citing McCormick, *Scientific Evidence: Defining a New Approach to Admissibility* (1982) 67 Iowa L.Rev. 879, 915.)[4]

■ The frequency with which defendants recently have challenged the alleged misuse of CSAAS evidence suggests this type of testimony may be unusually susceptible of being misunderstood and misapplied by a jury, perhaps because the expert commonly is asked to offer an opinion on whether the victim's behavior was typical of abuse victims, an issue closely related to the ultimate question of whether abuse actually occurred. (*People* v. *Bowker, supra*, 203 Cal.App.3d 385 [defendant asserted expert's testimony went beyond the recognized purpose of CSAAS evidence, and was used to actually prove the abuse occurred]; *People* v. *Bothuel, supra*, 205 Cal.App.3d 581 [same]; *People* v. *Harlan, supra*, 222 Cal.App.3d 439 [same].) Such testimony, especially from one recognized as an expert in the field of child abuse, easily could be misconstrued by the jury as corroboration for the victim's claims; where the case boils down to the victim's word against the word of the accused, such evidence could unfairly tip the balance in favor of the prosecution. A simple instruction similar to that described in *Bowker* would clearly define the proper use of such evidence and would prevent the jury from accepting the expert testimony as proof of the molestation. Furthermore, requiring such an instruction would avoid potentially erroneous convictions occasioned by counsel's inadvertent or incompetent failure to request a limiting admonition. Finally, there is no point in requiring that jurors be instructed concerning the proper weight to be accorded expert testimony (Pen. Code, § 1127b) when they are not advised of the proper use of this testimony.

We thus conclude that because of the potential for misuse of CSAAS evidence, and the potential for great prejudice to the defendant in the event

---

[4]In *Reeder* the court held the trial court had erred in failing to instruct on the weight and effect of expert testimony under Penal Code section 1127b. (65 Cal.App.3d at p. 241.) In *Malgren* the court concluded the trial court should have instructed the jury that (1) the dog tracking evidence was alone insufficient to establish identity; and (2) the training, proficiency and experience of the dog, its trainer and handler should be considered in assessing the proper weight to be given to such evidence. (139 Cal.App.3d at p. 242.)

such evidence is misused, it is appropriate to impose upon the courts a duty to render a sua sponte instruction limiting the use of such evidence. Accordingly, in all cases in which an expert is called to testify regarding CSAAS we hold the jury must sua sponte be instructed that (1) such evidence is admissible solely for the purpose of showing the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested; and (2) the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true.

■ Although the court failed to instruct the jury on the limited use of Dr. Schuman's testimony, this error was clearly harmless and does not require reversal. Dr. Schuman twice told the jury she had not met the victim and had no knowledge of the case. Her testimony was couched in general terms, and described behavior common to abused victims as a class, rather than any individual victim. In the face of this testimony, it is unlikely the jury interpreted her statements as support for Maryella's credibility. In addition, several other witnesses offered testimony that explained Maryella's retraction of her claims: Maryella's cousin and the social workers handling her case all testified that Maryella's family exerted great pressure on her to recant her claims and that Maryella was afraid of losing her mother's affection if she pursued the case against her grandfather. On this record it is not reasonably probable appellant would have received a more favorable verdict if an appropriate limiting instruction had been given.[5]

B.-G.*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is affirmed. The matter is remanded for resentencing in accordance with the views expressed herein.

Benson, J., and Peterson, J., concurred.

A petition for a rehearing was denied June 18, 1992.

---

[5]Having determined this error was harmless, we need not address appellant's contention that his counsel provided ineffective assistance by failing to request a limiting instruction, since appellant cannot show he was prejudiced by counsel's error. (*People* v. *Ledesma* (1987) 43 Cal.3d 171, 217 [233 Cal.Rptr. 404, 729 P.2d 839] [defendant must establish prejudice to obtain relief on an ineffective assistance claim].)

*See footnote, *ante*, page 947.