Filed 9/29/14   P. v. Brown CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B250843 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA397387) |
| v. | |
| STEVEN BROWN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Monica Bachner, Judge.  Affirmed.

Adrian K. Panton, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, James William Bilderback II, Supervising Deputy Attorney General, and Marc A. Kohm, Deputy Attorney General, for Plaintiff and Respondent.

# INTRODUCTION

A jury convicted defendant Steven Brown of corporal injury on a spouse (Pen. Code, § 273.5, subd. (a)), and found true an allegation that he personally inflicted great bodily injury (Pen. Code, § 12022.7, subd. (e)).[1] The trial court found that defendant had suffered a prior strike (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)) and a prior serious felony conviction (§ 667.5, subd. (b)). The trial court sentenced defendant to a total of 14 years in state prison, consisting of a three-year midterm, doubled to six years based on the prior strike finding, plus five years for the prior serious felony conviction, plus three years for the great bodily injury enhancement.

On appeal, defendant contends that the conviction must be reversed because the trial court failed to instruct the jury, sua sponte, with a jury instruction regarding the limited relevance of expert testimony regarding battered spouse syndrome, also referred to as intimate partner battering. We conclude that regardless of whether the trial court had a sua sponte duty to give the instruction, the omission of the instruction was harmless error because the evidence of defendant's guilt, independent of the effect of the expert testimony, was overwhelming. We therefore affirm the judgment.

# FACTUAL BACKGROUND

As of May 3, 2012, defendant and the victim, Adriana B, had been married for nine years. They lived in a house on property they shared with defendant's father, Steven Brown, Sr. ("Brown, Sr."), which was owned by defendant's grandmother. On May 4, 2012, around 2:00 a.m., defendant and Adriana began arguing in their bedroom. Adriana went into the hallway and defendant followed. He jerked her to the ground, held her down by her hair, and punched her in the face with his fist. Adriana briefly got away and went into the living room, where their two young children were sleeping. Defendant

---

[1] All further statutory references are to the Penal Code.

followed her and again jerked her to the ground and punched her several more times. Adriana managed to get away and opened the front door, at which point Brown, Sr. entered the home and took defendant outside. Defendant's repeated blows to Adriana's face resulted in her nose being broken in two places.

Adriana called 911 and told the operator that defendant had attacked her and that his father was holding him outside. Paramedics and police officers arrived a few minutes later, and Adriana told the responding officer that defendant had attacked her. The responding officer observed that Adriana's nose was bruised, her lip was swollen, there were red marks on her face, she complained of pain in the back of her head, and she was upset and crying. Adriana was taken by ambulance to Centinela Hospital.

Adriana spoke to Los Angeles Police Detective Sheryl Reynolds on the evening of May 4, and described to Detective Reynolds that defendant had beaten her during an argument, twice holding her down by her hair and punching her in the face as described above. Adriana said defendant had been drinking alcohol and using methamphetamines and marijuana. When Reynolds asked if Adriana wanted to prosecute defendant, she said she was not sure.

Between the time of defendant's arrest and his trial, he spoke to Adriana on the phone more than 75 times. As defendant was in custody, those calls were recorded, and some of the recordings were played to the jury. During one call, defendant told Adriana "I fucking love you, blood. You love me, but you don't fucking bow down and be my bitch, blood." He said he did not have anybody else besides her, and implied that she had been unfaithful. Adriana said she was not trying to "break you down or nothing, but damn, you making it seem like I'm the one *** nigger, you fucking broke my nose." In response, defendant blamed his behavior on using drugs and said he had been hallucinating. After asking her to tell him everything she had said to the police, "so I can see what kind of case I have," he said "I apologize about that nose, . . . I wish I could kiss you until you get better, but I fucked up. I'm so sorry, blood." Adriana told defendant during a different phone call that she had told the detective she did not want to prosecute,

3

and defendant asked if she had been told "how much time" he was going to get. During another phone call, defendant began the conversation by saying, "Don't you never fucking hang up on me again. *** your fucking life, bitch. Is you stupid? Don't you fucking hang up on me. You know I'm gonna get out one day, right?" He told her, "If you really wanted to be with me, you wouldn't bring your stupid ass to court." She responded that he preferred that she "get locked up," but he assured her she was not going to be locked up. He denied being mad at her, but added, "Just know one thing, baby. What goes around comes the fuck back around." He ended the call by saying, "Don't come to court."

During another call, defendant asked Adriana to hire an attorney to represent him and repeatedly apologized and said he loved her, promising to never hit her again. His comments included: "I went so crazy"; "I think it shouldn't a went that far, and I do apologize"; "it had to be the drugs"; "I didn't mean for *** to go that far outta control"; "I wish I could take that whole day back or just the few hours that a nigger lost his mind"; "Before I ever think about hitting you, *** fucking hit myself right out of the house. I'll run away before I fucking feel like raising my hand to you again. I'll just run away. I wouldn't stand there hit you no more"; and "I'm never gonna hit you again." Defendant repeatedly urged Adriana to help him get out of jail, saying, "Please, man, help me get out, man." She mentioned an arrest warrant could be issued if she "didn't show up." He said "you could show up, but just tell them . . . . Tell them the truth, *** you know. I mean, I think the—I think it's the drugs. That's what I think. Keep it real." After brief additional discussion, which was redacted, he said, "I need you to lie." He told her, "Try to help me get as less time as I can, Adriana. So I can get back to ***. See my kids."

On May 10, 2012, Detective Reynolds served Adriana with a subpoena to appear at the preliminary hearing. Adriana indicated she was reluctant to testify. Nonetheless, Adriana appeared at the preliminary hearing on May 22, 2012. She was hesitant to testify, but did answer some questions.

4

On June 4, 2012, Adriana sent an email to the prosecutor then handling the case, in which she said she had lied about defendant attacking her. She did not, however, mention the purported involvement of any third person. Adriana retained defendant's defense attorney and spoke with him several times before trial.

At trial, for the first time Adriana offered an entirely different version of events. She claimed that a woman named Kimberly Proctor, who was having an affair with defendant, came to the house around midnight. Adriana said she argued with Kimberly, and the argument progressed to a physical fight during which Kimberly broke Adriana's nose. Later, in order to prevent defendant from leaving the house, Adriana drugged defendant with Ambien. Because of the Ambien, defendant was groggy and accidentally bumped Adriana in the face with his elbow. Adriana claimed that she falsely identified defendant as her attacker—including to the 911 operator, the responding police officers, and Detective Reynolds—because she was angry at defendant for being unfaithful and was embarrassed that Kimberly had beaten her. As to why she did not mention Kimberly to the police, or at the preliminary hearing, Adriana said that she tried to contact Detective Reynolds to tell her the truth, but was unsuccessful. Detective Reynolds testified that to her knowledge Adriana never attempted to contact her. At the time of trial, Adriana was still living on property owned by defendant's grandmother.

Adriana acknowledged the phone calls with defendant, but said that when defendant apologized to her, he was only apologizing for his infidelity. When she told him that he had broken her nose, she meant that he did not make Kimberly leave their home and had allowed Kimberly to break her nose. She denied that he said he needed her to lie, claiming instead that he said "like." She had no explanation for why he said, "I'm never gonna hit you again", other than to say, "That's what it says, but I know it had a different meaning to it. We have a certain way of talking, which you probably wouldn't understand. Because I mean, I read along with it, and I tell you, the way you're taking it is not how it was meant."

Brown, Sr. testified that on the night of the incident he was awakened around 2:00 a.m. by loud arguing. He approached defendant's home and saw that the front door was open. He did not see Adriana at first, but observed defendant acting strangely. After accompanying defendant into the bedroom to get dressed, Brown, Sr. led defendant outside and waited with him until the police arrived. When they were in defendant's bedroom, Brown, Sr. detected a chemical odor he believed was PCP. Brown, Sr. had heard a loud bang earlier in the evening, but he had not investigated. Brown, Sr. said he had spoken to defendant two weeks previously "about arguing."

Gail Pincus testified as an expert on domestic violence. Her testimony was meant to educate the jury in general on how battered women think, feel, and behave when they are abused. According to Pincus, it was a common phenomenon for a woman in a relationship to endure abuse by a spouse, be briefly willing to report that behavior to law enforcement, and then recant the report. When the abuser is incarcerated, he often attempts to reassert power and control over his partner through telephone contact, during which the abuser typically alternates between apologizing and telling the victim he loves her, then calling her abusive names and blaming her for his predicament of being incarcerated. The abused partner begins by standing her ground, then is made to feel sorry for the abuser as he portrays himself as the victim. Frequently the abuser dictates to the woman the story that is going to be told in court, and the woman starts to feel more responsible for protecting the batterer than protecting herself. The victim rationalizes the incident and feels she has overreacted, and often recants her original report and tells authorities she lied. The abuser tells the victim there will be no further abuse, and she believes him.

Pincus stated that she had not read the police reports in this case and did not know any specifics about the relationship between defendant and Adriana. Even though the defense attorney had spoken to her by telephone as she was on her way to court and told her some things about the case, she said she was not tailoring her testimony to any

6

specific facts.  She clarified that she was not testifying on behalf of anybody; rather, her role was to educate the jury about common misconceptions about domestic violence.

Defendant did not call any witnesses and did not present evidence.

**DISCUSSION**

**I.      Failure to Instruct Regarding Limited Use of Expert Testimony on Intimate Partner Battering**

Defendant contends for the first time on appeal that the trial court failed to give a sua sponte limiting instruction regarding the permissible use of expert testimony on the subject of intimate partner battering, and that the erroneous omission of this limiting instruction constituted prejudicial error as measured by the standard enunciated in *People v. Watson* (1956) 46 Cal.2d 818, 836.  We conclude that even if the trial court was required to give the instruction in the absence of a defense request, its omission was not prejudicial and does not require reversal.

*A.      The Applicable Law*

"[Evidence Code] Section 801, subdivision (a), permits expert testimony on subjects 'sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.'  [Evidence Code] Section 1107, subdivision (a), provides:  'In a criminal action, expert testimony is admissible by either the prosecution or the defense regarding intimate partner battering and its effects, including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence, except when offered against a criminal defendant to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge.'" (*People v. Kovacich* (2011) 201 Cal.App.4th 863, 898.)

In *People v. Brown* (2004) 33 Cal.4th 892 (*Brown*), the California Supreme Court, in discussing the admissibility of expert testimony regarding the "cycle of violence" in an abusive relationship between intimate partners, concisely explained as follows:  "'When

7

the trial testimony of an alleged victim of domestic violence is inconsistent with what the victim had earlier told the police, the jurors may well assume that the victim is an untruthful or unreliable witness. [Citations.] And when the victim's trial testimony supports the defendant or minimizes the violence of his actions, the jurors may assume that if there really had been abusive behavior, the victim would not be testifying in the defendant's favor. [Citations.] These are common notions about domestic violence victims akin to those notions about rape and child abuse victims that this court discussed in *People v. Bledsoe* [(1984)] 36 Cal.3d 236 and [*People v.*] *McAlpin,* [(1991)] 53 Cal.3d 1289, and that the Court of Appeal discussed in *People v. Housley* [(1992)] 6 Cal.App.4th [947], 955-956, [where expert testimony was held to be admissible to explain a child's recantation of her molestation claim].' (*Brown*, *supra*, 33 Cal.4th at pp. 906-907.)"

The Defendant contends that the court was required to give CALCRIM No. 850, sua sponte. It would have read as follows: "You have heard testimony from [Gail Pincus] regarding the effect of (battered women's syndrome/ intimate partner battering[]). [Gail Pincus]'s testimony about (battered women's syndrome/intimate partner battering[]) is not evidence that the defendant committed any of the crimes charged against (him/her). You may consider this evidence only in deciding whether or not [Adriana B.'s] conduct was not inconsistent with the conduct of someone who has been abused, and in evaluating the believability of (his/her) testimony."

As defendant points out, the bench note for CALCRIM No. 850 indicates that there is a sua sponte duty to give the instruction when supported by the evidence. The bench note cites *People v. Housley* (1992) 6 Cal.App.4th 947 (*Housley*), which involved testimony by an expert on child molestation that victims of such abuse commonly delay reporting the abuse and often recant. (*Housley*, *supra*, at p. 952.) The *Housley* court noted that "It is well settled that expert testimony concerning [child sexual abuse accommodation syndrome (CSAAS)] only may be used to disabuse the jury of commonly held misconceptions regarding the behavior of abuse victims, and may not be used to corroborate the victim's claims of abuse. (*People v. Bowker* [(1988)] 203 Cal.App.3d

8

[384] at 394.) However, there is some disagreement concerning whether the defendant is entitled to a sua sponte instruction specifically limiting the use of this evidence." (*Housley*, *supra*, at p. 957.) The *Housley* court acknowledged that "[g]enerally, 'absent a request by a party, there is no duty to give an instruction limiting the purpose for which evidence may be considered.' (*People v. Nudd* (1974) 12 Cal.3d 204, 209, overruled on a different issue in *People v. Disbrow* (1976) 16 Cal.3d 101, 113; see also Evid. Code, § 355.) However, a trial court is obligated to give sua sponte instructions regarding the 'general principles of law relevant to the issues raised by the evidence.' (*People v. St. Martin* (1970) 1 Cal.3d 524, 531.) The court is also required to instruct the jury sua sponte on the weight to be given expert testimony. (Pen. Code, § 1127b.)" (*Housley*, *supra*, at 957.)

The *Housley* court observed that testimony from a recognized expert "easily could be misconstrued by the jury as corroboration for the victim's claims." (*Housley*, *supra*, at p. 958.) Thus, requiring an instruction defining the proper use of such evidence "would prevent the jury from accepting the expert testimony as proof of the molestation," and "would avoid potentially erroneous convictions occasioned by counsel's inadvertent or incompetent failure to request a limiting admonition. Finally, there is no point in requiring that jurors be instructed concerning the proper weight to be accorded expert testimony (Pen. Code, § 1127b) when they are not advised of the proper use of this testimony." (*Housley*, *supra*, at p. 958.) The court "conclude[d] that because of the potential for misuse of CSAAS evidence, and the potential for great prejudice to the defendant in the event such evidence is misused, it is appropriate to impose upon the courts a duty to render a sua sponte instruction limiting the use of such evidence." (*Housley*, *supra*, at 958-959.)

Respondent counters that the California Supreme Court has repeatedly held that there is no sua sponte duty to instruct regarding the limited admissibility of evidence. (Citing *People v. Valdez* (2012) 55 Cal.4th 82, 139; see, e.g., *People v. Riccardi* (2012) 54 Cal.4th 758, 824 [no sua sponte duty to instruct regarding the limited relevance of

hearsay testimony]; *People v. Hernandez* (2004) 33 Cal.4th 1040, 1051-1052 [no sua sponte duty to instruct regarding the limited relevance of gang evidence]; *People v. Farnam* (2002) 28 Cal.4th 107, 163-164 [no sua sponte duty to instruct regarding the limited relevance of character evidence].)  While that is an accurate statement, we do not find the categories of evidence considered in the cases cited by respondent to be particularly relevant to the situation before us, involving evidence by an expert regarding intimate partner battering and the limited purpose for which such evidence may be used by a jury.

In *People v. Collie* (1981) 30 Cal.3d 43, 63-64, our Supreme Court addressed, albeit in a different evidentiary context, the difference between cases in which courts have a sua sponte duty to instruct and those in which they do not:  "Defendant complains that the trial court should have instructed the jury *sua sponte* on the limited admissibility of evidence of previous assaults he allegedly committed on his wife.  [Fn.]  Although the trial court may in an appropriate case instruct *sua sponte* on the limited admissibility of evidence of past criminal conduct, we have consistently held that it is under no duty to do so.  [Citations.]  We have more recently decided that in many cases *sua sponte* instructions regarding relevant defenses [citations] and lesser included offenses [citations] are required because those matters are 'closely and openly connected' with the evidence and the fate of the defendant in cases to which they apply.  [Citations.]"  (*Id.* at pp. 63-64.)  "There may be an occasional extraordinary case in which unprotested evidence of past offenses is *a dominant part of the evidence against the accused, and is both highly prejudicial and minimally relevant to any legitimate purpose*.  In such a setting, the evidence might be so obviously important to the case that *sua sponte* instruction would be needed to protect the defendant from his counsel's inadvertence."  (*Id.* at 64; italics added.)  The *Collie* court concluded that in the case before it the defendant had failed to show that the limited admissibility of evidence of his past criminal conduct deserved unsolicited recognition and instruction by the trial court.  (*Ibid.*)

10

*B.      Analysis*

In our view there remains some question whether a court is obligated sua sponte to give a limiting instruction concerning expert testimony on battered women's syndrome. Only *Housley*, *supra*, 6 Cal.App.4th at p. 947 has held that a court has a sua sponte duty to give a limiting instruction in that context. Since *Housley* was decided in 1992, that aspect of the case has not been approved or cited by any subsequent reported case. We note that Evidence Code section 355 provides that "[w]hen evidence is admissible . . . for one purpose and is inadmissible . . . for another purpose, the court *upon request* shall restrict the evidence to its proper scope and instruct the jury accordingly." (Italics added.) However, we agree with the concerns expressed in *Housley* that expert testimony regarding intimate partner battering is "'closely and openly connected'" with the evidence. (*Collie, supra*, at p. 64.) While the expert testimony is highly relevant to a legitimate purpose—educating the jury regarding the dynamics of intimate partner battering—the potential prejudice to a defendant is significant if the jury misuses such testimony as corroborative evidence of guilt.

We conclude, however, that we need not definitively decide whether the court had a sua sponte duty to instruct on the limited permissible use of Pincus's testimony regarding intimate partner battering. Even assuming that such a duty existed, the absence of the instruction was harmless error and does not require reversal.

Pincus's testimony was not directed to prove and did not state that defendant in fact physically abused Adriana, was instead properly limited to discussion of the characteristics of battered woman's syndrome. She made clear that she did not know the facts of the case and was discussing the syndrome in general rather than addressing any particular factual scenario, including that involved in this case. Pincus's testimony provided an explanation that counter-balanced the defense contention that Adriana lied about defendant physically assaulting her because she was angry that he had been unfaithful to her. Her testimony was couched in general terms, and described behavior common to abused victims as a class, rather than any individual victim. In the face of

11

this testimony, it is unlikely the jury interpreted her statements as corroborative evidence that defendant abused Adriana. Because Pincus's testimony contained only generalized explanations of the dynamics of domestic violence and she specifically stated she was not expressing an opinion regarding defendant and Adriana's relationship, it is not reasonably probable the jury misused Pincus's testimony to draw the inference prohibited by Evidence Code section 1107, subdivision (a). It is not reasonably probable a more favorable result would have occurred had the limiting instruction been given. (*People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

As distinguished from *Housley*, *supra*, 6 Cal.App.4th at p. 958, we note that this case did not come down to a credibility contest between the victim's word and the defendant's. There was ample evidence, primarily in defendant's own voice (as well as Adriana's) on the recorded telephone calls from jail, acknowledging that he had struck her and broken her nose. He apologized profusely for having done so, blamed his drug use, and vowed never to hit her again. He asked her to help him get out of jail, told her not to go to court, and asked her to lie about what had happened. His demeanor toward Adriana during the telephone calls was often distinctly controlling and abusive. Adriana had already begun expressing doubt about prosecuting defendant when she spoke to Detective Reynolds the night of the assault. Yet, it was not until much later that she first reported that Kimberly Proctor had broken her nose. The testimony by Pincus provided a highly relevant explanation, beyond the ken of the average juror, as to why Adriana would retract her report that defendant had abused her and testify in his defense as she did at trial, even in the face of the recorded telephone calls.

The jury was properly instructed that it should consider with caution any statement made by defendant tending to show his guilt, *unless the statement was recorded*, and that a defendant may not be convicted of a crime based on his out-of-court statements alone. The jury was instructed that it could rely on defendant's out-of-court statements to convict him if it concluded that other evidence—which could be slight and need only be enough to support a reasonable inference that a crime was committed—showed that the

12

charged crime was committed. In addition, the jury was instructed that the identity of the person who committed the crime may be proved by the defendant's statements alone. Thus, as to the critical evidence regarding defendant's guilt, his own recorded statements, the jury was properly instructed. Brown, Sr. provided additional corroborative evidence when he acknowledged that defendant was using methamphetamines and PCP at the time of the incident, and that defendant and Adriana were loudly arguing. Brown, Sr.'s testimony regarding defendant's drug use was consistent with what defendant said during the telephone calls as the reason he lost control and injured Adriana, and directly contradicted Adriana's trial testimony that she had secretly given defendant Ambien. Considered as a whole, the evidence of defendant's guilt was overwhelming, and therefore the trial court's error, if any, in failing to give a limiting instruction regarding Pincus's testimony was clearly harmless.

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

COLLINS, J.

We concur:

EPSTEIN, P. J.

MANELLA, J.

13