Filed 9/3/25  P. v. Cortez CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D085998 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. RIF2001296) |
| SALVADOR HUERTA CORTEZ, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of Riverside County, Mark E. Singerton, Judge.  Affirmed.

Michael C. Sampson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Maxine Hart, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Salvador Huerta Cortez of six sexual crimes against his daughters, Jane Doe 1 and Jane Doe 2.[1] Cortez appeals, claiming the trial court erred by instructing the jury with CALCRIM No. 1193 in connection with the use of expert testimony regarding Child Sexual Abuse Accommodation Syndrome (CSAAS). Alternatively, he claims his counsel was ineffective for failing to object to this instruction.

We need not decide whether the trial court erred when it instructed the jury with CALCRIM No. 1193 because we conclude on this record that any such error was harmless beyond a reasonable doubt. We further conclude Cortez cannot show his trial counsel provided ineffective assistance based on the failure to object to the instruction. We affirm the judgment.

I.

FACTUAL BACKGROUND

When Doe 1 and Doe 2 were children, they occasionally stayed with Cortez on the weekends. During these weekend visits, Cortez sexually abused Doe 1 and Doe 2. The abuse continued for some time before either child reported it.

A. *Prosecution Testimony About Cortez's Abuse*

Cortez lived with his mother, Maria, and brother, Sergio, in a three-bedroom house, where they each had separate bedrooms. When Doe 1 and Doe 2 visited, they slept in Cortez's bedroom, in his bed, where he abused them individually while their sibling sometimes laid on the same bed.

Doe 1, the younger sister, was between 8 and 12 years old when Cortez abused her. She testified to eight instances of sexual abuse, including oral

---

[1] A jury convicted Cortez of one count of aggravated sexual assault of a child (Pen. Code, § 269, subd. (a)(4)); one count of a lewd or lascivious act on a child by force, fear, or duress (Pen. Code, § 288, subd. (b)(1)); and four counts of a lewd or lascivious act on a child (Pen. Code, § 288, subd. (a)).

2

copulation and vaginal penetration, which she struggled to disclose even at trial.

Doe 2 was between 10 and 11 years old when Cortez abused her. She testified to three to four instances wherein Cortez touched her vagina with his hand.

When this abuse occurred, Doe 1 and Doe 2 did not tell each other. But Doe 2 stopped sleeping in Cortez's room and began sleeping in Maria's room. While Doe 2 slept in Maria's room, Cortez continued to abuse Doe 1 in his room.

Doe 1 disclosed Cortez's abuse to her friend, Q.P. Q.P. and Doe 1 were friends between the third and sixth grades, and Q.P. estimated this conversation occurred when they were in the fifth grade. Q.P. recalled Doe 1 appeared "distraught" and cried through most of this conversation. Specifically, Doe 1 disclosed that when she visited Cortez's house, she and her siblings would share the bed with Cortez, and he would touch her inappropriately. Q.P. understood that the abuse had happened "multiple times" and advised Doe 1 to report the abuse to Doe 1's mother, Alicia.

Doe 1 and Doe 2 stopped going to visit Cortez because Sergio told Alicia that Cortez was not able to take care of his children, they weren't safe with him, and the family did not want them at their house. After the visits stopped, Doe 1 and Doe 2 each told Alicia about Cortez's abuse. Alicia testified that Doe 1 disclosed Cortez had touched her all over, and Doe 2 reported Cortez had touched her "private." Alicia did not call the police. She started taking Doe 1 and Doe 2 to therapy because she was concerned for their welfare. Alicia had observed Doe 2 behaving "abnormal[ly]" and appearing to "shut[ ] down" between her fourth and sixth grades. Doe 2 did not want to go to outside or to school, hid under the blankets on her bed, and

3

experienced emotional outbursts when she was around anyone but Alicia.

Doe 1 and Doe 2's therapist testified that it was difficult for Doe 1 and Doe 2 to talk about the abuse. Eventually, Doe 1 disclosed in therapy that Cortez touched her "private area," and she was forced to do oral sex, but Doe 1 did not recollect any other penetration. Doe 2 disclosed that Cortez would touch her "private area." Doe 1 and Doe 2's therapist notified Alicia that she needed to make a police report because Doe 1 and Doe 2 were ready to "talk"; Doe 1 and Doe 2 participated in a law enforcement interview that led to the charges in this case.

At trial, Doe 1 and Doe 2 each explained their reasoning for not reporting the abuse sooner. Doe 1 stated that when Cortez abused her, he told her to be quiet, and when she tried to pull away from him, he grabbed her wrist tightly, hurting her. She listened to him and stayed quiet because she was scared and did not want to get in trouble. Doe 1 also did not know if the abuse was "normal."[2] But even without knowing if it was normal, she did not want it to happen to her siblings and thought she was protecting them when it happened to her instead of them.[3] Doe 1 was also embarrassed. When Doe 1 told her mother about the abuse, Doe 1 did not think that the conversation went well. Doe 1 thought her mother was angry with her or in denial.

Doe 2 also felt embarrassed to talk about the Cortez's abuse. And Doe 2 feared what would happen to her and her family if she reported it.

---

[2]     Doe 1's disclosure to her friend came about because Doe 1 was asking her friend questions to learn if Cortez's abuse was "normal."

[3]     The girls had another sibling who visited Cortez with them.

B. *Evidence of CSAAS*

The prosecution presented Dr. Veronica Thomas, a licensed psychologist, as an expert witness to describe CSAAS. Prior to her testimony and at the request of defense counsel, the trial court instructed the jury with CALCRIM No. 1193, after it overruled the defense's objection to this evidence during in limine proceedings.

### 1. *CALCRIM No. 1193*

The trial court instructed the jury as follows:

"That you'll be hearing testimony here from Dr. Thomas regarding Child Sexual Abuse Accommodation Syndrome. Child Sexual Abuse Accommodation Syndrome relates to a pattern of behavior that may be present in child sexual abuse cases. Testimony as to the accommodation syndrome is offered only to explain certain behavior of an alleged victim of child sexual abuse.

"Dr. Thomas's testimony about Child Sexual Abuse Accommodation Syndrome is not evidence that the defendant committed any of the crimes charged against him. You may consider this evidence only in deciding whether or not the alleged victims in this case, whether their conduct was consistent with the conduct of someone who has been molested and in evaluating the believability of the alleged victims."

After the trial court read CALCRIM No. 1193, a juror asked for a rereading of the last two sentences. In response, the court reread the instruction, elaborating that the testimony is not evidence that Cortez committed the charged crimes:

"Dr. Thomas's testimony about Child Sexual Abuse Accommodation Syndrome is not evidence that the defendant committed any of the crimes charged against him. Okay?

"It's not evidence that he committed the crimes. You may consider this evidence only, and I'm talking about

5

Dr. Thomas's testimony, only in deciding whether or not [Doe 1] or [Doe 2]'s conduct was consistent with the conduct of someone who has been molested and in evaluating their believability.  Okay?

"It's not to be considered at all for the purpose of whether or not Mr. Cortez committed the charged crimes.  You cannot do that.  You cannot use this evidence for that, and it's not meant for that.  It's only to determine believability, and whether or not the alleged victim's conduct was consistent with the conduct of someone who has been molested.  Okay?"

Defense counsel neither objected to the language of the instruction nor to the trial court's additional clarification and admonishment.  The court subsequently repeated CALCRIM No. 1193 prior to the jury's deliberations, modifying the instruction only to explain that the jury had now heard Dr. Thomas's testimony.

### 2. *The CSAAS Testimony*

Dr. Thomas explained that CSAAS is a therapy tool that helps dispel misconceptions related to the sexual abuse of children by explaining the complexity of abusive relationships between children and known adults.  For example, Dr. Thomas described that it was a common misconception that children were only molested by strangers and that they would tell someone if they were abused.  She opined that when child sexual abuse is perpetrated by someone a child knows, CSAAS explains the child often understands it is a secret, may feel helpless and accommodate the abuse because they feel "trapped," and the abuse often remains a secret until later in life, with disclosure commensurate to their comfort in discussing what occurred.  Dr. Thomas further testified that fear, trauma, and a child's developmental stage can all impact a person's ability to recall details of abuse and disclose them.

6

Dr. Thomas cautioned that these possible feelings and behaviors, known as CSAAS factors, can help explain the complexity of such a relationship, but they cannot diagnose whether a child has been sexually abused. Dr. Thomas stressed this limitation repeatedly throughout her testimony, explaining CSAAS factors should "never [ ] be used to determine whether or not someone was molested" and that using them for that purpose would be "inappropriate." In addition, Dr. Thomas explained that her testimony was limited to social science literature. She did not know Cortez, had not interviewed Doe 1 or Doe 2, and had not reviewed anything related to the case.

During its deliberations, the jury requested and was provided a readback of Dr. Thomas's testimony regarding the CSAAS factors and memory.

C. *Defense Testimony*

Maria and Sergio testified they never saw anything inappropriate occur between Cortez and his daughters. And any abuse could not have occurred in Cortez's bedroom because Doe 1 and Doe 2 never slept in Cortez's bedroom; they always slept in Maria's bedroom. Maria and Sergio also admitted they loved Cortez and did not want Cortez to get in trouble.

Maria could not recall her granddaughter, Doe 2's, name and when asked to describe her relationship with her granddaughters, she stated they "were a little rude." Sergio explained the extent of his relationship with Doe 1 and Doe 2 was trying to "buy them ice cream" and "keep them happy," but they were children who mostly fought and cried when they spent the weekends.

II.

DISCUSSION

A. *Any Error From Using CALCRIM No. 1193 Was Harmless.*

Cortez does not challenge the admission of the CSAAS testimony. He argues CALCRIM No. 1193 incorrectly states the law because it does not adequately explain CSAAS testimony cannot be used to prove a defendant's guilt as there is no difference between using CSAAS testimony to evaluate credibility and using it to find the victims' claims true.

Additionally, Cortez contends the last sentence of the instruction is improper because "it permitted the jurors to use the CSAAS testimony as evidence that the victim's behavior in this case 'was consistent with the conduct of someone who has been molested,'" while CSAAS testimony "has been strictly limited to providing evidence that the victim's behavior was *not necessarily inconsistent* with that of an abused child."[4]

The purpose of CSAAS testimony is to educate jurors that children may exhibit a range of reactions to being sexually abused, some of which a jury may find counterintuitive.[5] CSAAS testimony may be used "to say that child

---

[4]     Because we conclude any error was harmless beyond a reasonable doubt, we need not decide whether Cortez forfeited or waived this claim of error when he requested the instruction at trial and did not object to, or request to, modify the language of the instruction. (See *People v. Grandberry* (2019) 35 Cal.App.5th 599, 604 [absent reversible error, defendant's substantial rights are unaffected]).

[5]     See *People v. McAlpin* (1991) 53 Cal.3d 1289, 1301 [CSAAS evidence is needed "'to explain the emotional antecedents of abused children's seemingly self-impeaching behavior'"]; *People v. Lapenias* (2021) 67 Cal.App.5th 162, 171 [CSAAS evidence is admissible to "disabuse jurors of five commonly held 'myths' or misconceptions about child sexual abuse"]; *People v. Gonzales* (2017) 16 Cal.App.5th 494, 504 ["The purpose of CSAAS is to understand a child's reactions when they have been abused."].

8

abuse victims often exhibit a certain characteristic or that a particular behavior is not inconsistent with a child having been molested." (*People v. Bowker* (1988) 203 Cal.App.3d 385, 393.) But it cannot be used to conclude whether a child has been abused. (*Ibid*.; *People v. Housley* (1992) 6 Cal.App.4th 947, 959.)

We need not decide whether CALCRIM No. 1193 correctly states the law because we conclude on this record that, even if the instruction amounted to a violation of Cortez's due process rights, any such error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).) An error is harmless beyond a reasonable doubt if there is no "reasonable possibility that the [error] complained of might have contributed to the conviction." (*Ibid*., quoting *Fahy v. State of Connecticut* (1963) 375 U.S. 85, 86-87.) "Since *Chapman*, [courts] have repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 681.)

We conclude there is no reasonable possibility that the instruction contributed to Cortez's convictions.

First, the trial court explicitly admonished the jury that CSAAS testimony was "not to be considered at all for the purpose of whether or not Mr. Cortez committed the charged crimes," adding, "You cannot do that. You cannot use this evidence for that, and it's not meant for that." Moreover, the court explained that while the jury must consider the expert's opinions, the jury did not have to accept those opinions as "true or correct" (CALCRIM No. 332). The court also instructed the jury that it "alone must judge the credibility or believability of the witnesses" (CALCRIM No. 226). Together

9

these instructions communicated to the jury that it could not use the expert's testimony as evidence that the charged crimes occurred. (See *People v. Jablonski* (2006) 37 Cal.4th 774, 831 ["In assessing a claim of instructional error, 'we must view a challenged portion "in the context of the instructions as a whole and the trial record" to determine " 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." ' "].)

Second, Dr. Thomas's own testimony, which the jury heard twice, stressed that the CSAAS factors are "never to be used to determine whether or not someone was molested." Therefore, even if the jury believed Dr. Thomas's testimony, the jury knew that it could not use that testimony to determine if Cortez had sexually abused Doe 1 or Doe 2.

Third, Doe 1's and Doe 2's credibility was supported through other evidence. Doe 1 and Doe 2 explained their reasons for not disclosing the abuse sooner, which rehabilitated their credibility because it explained their seemingly inconsistent behavior. This testimony was separate from the CSAAS evidence and CALCRIM No. 1193.

Doe 1's and Doe 2's credibility was also supported by witnesses who testified to their earlier reporting. For example, the defense challenged Doe 1's and Doe 2's testimony that the abuse occurred when they laid in the same bed with Cortez by introducing testimony from Maria and Sergio that the girls always slept in Maria's room. But Q.P. corroborated Doe 1's and Doe 2's testimony by sharing that Doe 1 disclosed in the fifth grade that Cortez abused her in bed, and she and her siblings "would sometimes all share the bed with [Cortez]." Q.P. was 19 years old when she testified and had not been friends with Doe 1 since the sixth grade. Unlike Maria and Sergio, who could be motivated to protect Cortez, Q.P. had no apparent

10

motivation to lie about Doe 1's prior statements.  Given the corroborating evidence and considering the record as a whole, we conclude that any error in giving CALCRIM No. 1193 was harmless beyond a reasonable doubt.  (See *Chapman, supra,* 386 U.S. at p. 24.)

B. *Cortez Cannot Demonstrate Ineffective Assistance of Counsel.*

Cortez next argues his counsel was ineffective for failing to object to CALCRIM No. 1193.  Having determined that any error in giving this instruction was harmless beyond a reasonable doubt, we conclude he cannot show he was prejudiced by his counsel's failure to object to the instruction. (*Strickland v. Washington* (1984) 466 U.S. 668, 694, 700 [defendant must show a reasonable probability that, but for counsel's unprofessional errors the outcome would have been different and a failure to show sufficient prejudice defeats an ineffectiveness claim].)

DISPOSITION

The judgment is affirmed.

O'ROURKE, Acting P. J.

WE CONCUR:

IRION, J.

RUBIN, J.

11