Filed 8/28/23  P. v. Smith CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| THE PEOPLE, | C096400 |
| Plaintiff and Respondent, | (Super. Ct. No. 20CF04001) |
| v. | |
| KYLE SHANE SMITH, | |
| Defendant and Appellant. | |

A jury found defendant Kyle Shane Smith guilty of engaging in sexual penetration of a child under 10 years of age but could not reach a verdict on a count of continuous sexual abuse of another child under 14.  The trial court sentenced defendant to 15 years to life.  On appeal, defendant argues the trial court erred when it allowed a detective to testify as both a Child Sexual Abuse Accommodation Syndrome (CSAAS) expert and as an investigating officer.  He further argues the trial court erred in failing to sua sponte instruct the jury with CALCRIM No. 1193.  We affirm the judgment.

## FACTS AND HISTORY OF THE PROCEEDINGS

The complaint, deemed an information, charged defendant with one count of continuous sexual abuse of L.S., a child under the age of 14. (Pen. Code, § 288.5 subd. (a)—count 1; statutory section citations that follow are to the Penal Code unless otherwise stated.) It also charged defendant with sexual penetration of C.S., a child 10 years of age or younger. (§ 288.7, subd. (b)—count 2.)

During voir dire, defendant filed a written motion in limine to exclude CSAAS evidence due to the jurors' responses to questions during voir dire which revealed many of them already agreed that sexual assault victims may delay disclosing allegations for many different reasons. The trial court delayed its ruling on this issue and the trial commenced.

The victims' mother, Lisa S. (mother), was married to defendant for 11 years. They had three daughters. Mother testified there was domestic violence in her relationship with defendant.

Mother worked at Feather Falls Casino between August and December of 2016 and at Denny's between November 2017 and November 2018. She split up with defendant and left Oroville in November 2018, moving to Roseville. Mother described a photograph of her injuries during her final confrontation with defendant to the jury and the trial court received the photograph into evidence.

Mother learned defendant planned to seek visitation with their children about three to four weeks prior to contacting the police in this case to report the sexual abuse of her daughters.

Eleven-year-old L.S. testified she had lived in Roseville for the two and a half years prior to trial with her mother, her sisters (A.S. and C.S.), and other relatives. Before that, she lived in Oroville with her father (defendant), her mother, and her sisters. While living in Roseville, L.S. reported her father had sexually abused her. She did not know why she did not tell anyone about it right after it happened.

L.S. described the assault as follows:  One day, while her mother was at work at Feather Falls Casino, L.S. went in to cuddle with defendant.  Defendant was in his underwear but later took them off.  Defendant told L.S. to take her clothes off, and she did.  She was scared.  Defendant told L.S. to lift one of her legs, and he lifted his leg and placed it between her legs.  His private touched her body.  L.S. also said defendant touched her butt.  L.S. testified defendant "put his private touching my private."  L.S. testified this happened every time she tried to cuddle with defendant which was three to five times.  During her recorded interview with law enforcement, she said it happened four times.

L.S. later clarified "private" corresponded to the part of the body where she and her father peed.  She also said when he touched her butt with his private, it was on the "hole."

L.S. also testified that another time during a game of hide-and-seek with her sisters, defendant hid her under his blanket.  While she was hiding, he touched her "private."

L.S. spoke to a law enforcement officer and told that person she did not like that her mother said defendant did drugs.  When she first spoke to law enforcement, L.S. said her mother was there to help her with her memories and "[s]o I said the right things."

L.S.'s sister, nine-year-old C.S., also testified.  C.S. said her father and her mother did not get along well when they lived together.  They were always arguing and fighting.  C.S., however, could not identify defendant at trial.

After they moved to Roseville, C.S. told her mother that her father had previously touched her in "uncomfortable spots" meaning where she went pee.  This was the first time she told anyone about it.

C.S. described the assault as follows:  Her father seemed upset, so she went into his bedroom to comfort him.  At that time, defendant put his finger inside her body where she goes pee.  Her mother was at work at Denny's.  When she told the police officer

3

about this, the officer used a fish (as a substitute for defendant's finger) and a fishbowl (as a substitute for her private part) to simulate and confirm what defendant had done.

After an Evidence Code section 402 hearing, the trial court ruled the victims' 14-year-old sister, A.S., could testify about an uncharged act of sexual assault defendant committed on her.

Like her sisters, A.S. testified she lived in Oroville with her mother, father, and sisters. During that time, A.S. testified her father treated her mother miserably and constantly hit her mother. After A.S. heard what L.S. revealed, A.S. told her mother about another incident. A.S. was relaxing on the couch and her father asked her to follow him into his bedroom. While she was facing him, he reached out his hand and touched her between her thigh and her private area on the outside of her clothing. She felt uncomfortable, told him, "No," and then left the room. She never told anyone about this before because her father told her not to tell anybody.

During the two interviews of A.S. before the trial, she told law enforcement defendant "tried" to touch her, not that he actually touched her. Further, she originally denied anything happened between her and defendant to her mother, until after she learned what happened to her sisters. Two days prior to trial, A.S. told a defense investigator she told her mother she did not remember what happened.

The trial court conducted another Evidence Code section 402 hearing to preview the testimony of Detective Mary Barker. Noting the defendant's CSAAS objection to this testimony, the court stated, "[T]he Court will allow Detective Barker to testify as an expert with regards to her training and experience as it relates to reasons why children have delayed reporting to adults or authorities in sexual molestation investigations. [¶] I want to caution counsel though. And [prosecutor], you've made a clear record that you don't intend on eliciting testimony from Detective Barker about her interviews of the children involved in this case. My concern, if you were to do that, would be that there would be some confusion with regards to the purpose behind Detective Barker's

4

testimony, and I don't think it would be appropriate to have her testify in both capacities, as that could be viewed as vouching for the witness's veracity. And that, in the Court's view would be inappropriate." In response to defendant's further objection, the prosecutor stated, "[T]here's no case specific information that would be testified to by Detective Baker. . . . These are just general impressions she's gotten over her little more than a year interviewing over a hundred, or around a hundred victims of sexual abuse, but also the hours of training she attended where those issues are common."

In line with the trial court's ruling, the prosecutor elicited testimony from Detective Barker that it is common for victims of sexual abuse to delay reporting abuse for many reasons. She did not initially testify to the facts of this case other than to provide the foundation for the Child Abusers Response Team (CART) video interviews of the children. The prosecutor played the CART interviews for the jury.

On cross-examination, however, defendant's counsel chose to delve into issues specifically related to this case. He asked Detective Barker about the concept of "grooming" children for sexual abuse. He then directed Detective Barker to A.S.'s testimony as to how her father put her on time-outs as punishment, as well as all of the children's testimony concerning the discord in the home. Detective Barker agreed with counsel this discord would "[s]ometimes" be counterproductive to the grooming process.

Defense counsel next asked Detective Barker if she was familiar with the concept of alienating victims from the outside world to limit their ability to report abuse. When Detective Barker responded in the affirmative, Detective Barker agreed with counsel the children had access to school, friends, and their extended family.

Defense counsel further elicited case-specific testimony from Detective Barker that she was present during the original interviews of the girls prior to the recorded CART interviews. Detective Barker confirmed the girls' mother was present during the entirety of the initial interviews and provided direction to her daughters as they told their story to law enforcement. As to the CART interviews, counsel cross-examined Detective

Barker on the style of questioning used in the CART interview as being unduly suggestive. Counsel also questioned Detective Barker to highlight inconsistencies between A.S.'s testimony at trial and what she said in the two interviews with law enforcement.

On redirect, the prosecutor asked Detective Barker if she had experience with victims who told their experiences multiple times and how their memories could get better with the retelling. Detective Barker explained this can happen because the victim is reliving the moment. Detective Barker also explained that as children become more comfortable and confident, they may describe more abuse in later interviews.

On recross, defense counsel asked Detective Barker whether A.S. appeared to be a confident person. Detective Barker responded, "Just because someone appears confident on the outside doesn't make them confident on the inside." Counsel continued, "But she appeared confident in that interview in August; correct?" and Detective Barker responded, "She appeared."

Defendant testified in his defense, describing the victims' mother as an emotionally manipulative person who tried to entice him to be abusive to her. He also asserted she planted the stories in the girls' heads. He told the jury his version of the final episode of domestic violence for which he pleaded guilty to felony domestic violence and three counts of child endangerment. As of June 2020, defendant intended to seek full custody of his children.

At trial, defendant denied committing any of the acts against his children.

During the jury instructions conference, defendant's counsel did not request CALCRIM No. 1193, nor did the issue of the admission of CSAAS evidence come up.

In closing, the prosecutor focused only on the testimony of each of the victims. He did not raise the testimony of Detective Barker at all. In defendant's closing, however, he raised the testimony of Detective Barker several times: Detective Barker had experience with children not telling the truth, Detective Barker described the

6

questioning in the original interviews should have been open-ended, Detective Barker shared her knowledge of grooming and alienation, and it did not happen here. Defense counsel raised the fact that Detective Barker testified A.S. did not tell her or the CART interviewer her father had actually touched her in the earlier interviews.

In rebuttal, the prosecutor again focused on the testimony of the witnesses other than Detective Barker. He did respond to the defense argument regarding grooming, highlighting that Detective Barker said grooming included highly negative experiences and pointed to evidence defendant beat the mother in their household.

The jury found defendant guilty of sexual penetration perpetrated against C.S. (count 2), but could not reach a verdict on the charge of continuous sexual abuse perpetrated against L.S. (count 1). On the prosecution's motion, the trial court dismissed count 1 in the interest of justice.

Defendant replaced his trial counsel and new counsel brought a motion for a new trial, in part based on the testimony of Detective Barker. The trial court denied the motion, stating Detective Barker was properly designated as an expert, she was not asked to apply psychology to the facts of this case, she did not cross the line into an inappropriate or unqualified opinion in this case, and she did not vouch for the veracity of the witnesses.

The trial court sentenced defendant to 15 years to life. Defendant filed a timely notice of appeal.

DISCUSSION

I

*CSAAS Testimony*

Defendant argues it was in error for the trial court to allow Detective Barker to testify as to CSAAS issues and as a percipient witness. Defendant admits that California

7

courts have permitted the use of CSAAS evidence for limited purposes, but argues it was inadmissible here because it amounted to vouching for the child witnesses.

Expert opinion testimony is admissible when the subject matter is "beyond common experience," and the opinion would assist the jury. (Evid. Code, § 801, subd. (a).) An expert opinion may be provided at trial even if the jurors have some knowledge of the topic, as long as the testimony would assist the jury. (*People v. Prince* (2007) 40 Cal.4th 1179, 1222 [an expert may testify on a subject about which jurors are not " 'wholly ignorant' "].) We review the trial court's decision to admit expert testimony for abuse of discretion. (*People v. McDowell* (2012) 54 Cal.4th 395, 426.)

CSAAS is a model for understanding the behavior of children who have been sexually abused. The five components of the model are secrecy, helplessness, accommodation, disclosure, and recantation. (*People v. Mateo* (2016) 243 Cal.App.4th 1063, 1069 (*Mateo*).) In California, "it has long been held that in a judicial proceeding presenting the question whether a child has been sexually molested, CSAAS is admissible evidence for the limited purpose of disabusing the fact finder of common misconceptions it might have about how child victims react to sexual abuse." (*In re S.C.* (2006) 138 Cal.App.4th 396, 418; see also *Mateo*, at p. 1069; *People v. Housley* (1992) 6 Cal.App.4th 947, 955-956 (*Housley*).) Although expert testimony about how child sexual abuse victims commonly react is not admissible to show a child has in fact been sexually abused, it is admissible to show the alleged victim's conduct was not inconsistent with the conduct of someone who has been molested and to evaluate the believability of the alleged victim's testimony. (*Mateo*, at p. 1069.)

Here, defendant does not challenge the admission of Detective Barker's testimony that children commonly delay reports of abuse. That was the objection he raised at trial. Further, Detective Barker did not opine generally on the theory of CSAAS; on direct, she only testified that it was common children delayed report of the abuse based on her training and her experience in interviewing over 100 children.

8

Rather, on appeal defendant objects that Detective Barker provided *case-specific* testimony about grooming, alienation, and witness confidence. Defendant forfeited any objection to this testimony, not only because he failed to object to the admission of that testimony when it was proffered (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 160 [failure to object to evidence admitted at trial forfeited issue on appeal because it denied the prosecutor an opportunity to justify its admission in light of the state of the evidence at that point in the trial, and denied the trial court an opportunity to decide this issue in the first instance], but also because he failed to move to strike it after he affirmatively solicited this evidence (*People v. Abel* (2012) 53 Cal.4th 891, 924). For these same reasons, we cannot conclude the trial court abused its discretion by allowing the prosecutor to question Detective Baker concerning a subject that defendant brought forth for the first time in his own cross-examination. (*People v. Penrice* (1961) 195 Cal.App.2d 360, 364 [principal function of redirect examination is to reply to new matters drawn out on cross-examination and to explain or rebut adverse testimony or inferences developed on cross-examination].)

## II

### *CALCRIM No. 1193*

Defendant argues the trial court erred in failing to sua sponte provide a limiting instruction that Detective Barker's testimony should not be used as proof that sexual abuse actually occurred. Defendant acknowledges that there is a split in authority, with the majority of cases holding the trial court has no sua sponte duty to so instruct and a single case holding the contrary. (*Mateo, supra*, 243 Cal.App.4th at pp. 1073-1074; but see *Housley, supra*, 6 Cal.App.4th at pp. 958-959 [finding a sua sponte duty to give an instruction similar to CALCRIM No. 1193].) He also acknowledges he did not request this instruction at trial.

Generally, absent a request by the defendant, a trial court has no sua sponte duty to give a limiting instruction. (*People v. Smith* (2007) 40 Cal.4th 483, 516.) However, in

*Housley, supra*, 6 Cal.App.4th 947, the appellate court found that because of the potential misuse of CSAAS evidence and the resulting prejudice to the defendant, in all cases in which an expert is called to testify regarding CSAAS, the trial court had a sua sponte duty to instruct that "(1) such evidence is admissible solely for the purpose of showing the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested; and (2) the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true." (*Id.* at pp. 958-959.) The *Housley* court reasoned special precautions must be taken to ensure the jury does not accord an expert's opinion undue weight. A jury may readily accept the CSAAS expert testimony because it is beyond the jury's expertise. (*Id.* at pp. 957-958.) According to the court, CSAAS evidence is unusually susceptible of being misunderstood and misapplied by a jury, "perhaps because the expert commonly is asked to offer an opinion on whether the victim's behavior was typical of abuse victims, an issue closely related to the ultimate question of whether abuse actually occurred." (*Id.* at p. 958.)

CALCRIM No. 1193, introduced post-*Housley*, states, in part, "testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against (him/her) [or any conduct or crime[s] with which (he/she) was not charged]. [¶] You may consider this evidence only in deciding whether or not . . . conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of (his/her) testimony."

The commentary for CALCRIM No. 1193 acknowledges that the jurors must understand that the research on CSAAS assumes a molestation occurred and seeks to describe and explain children's common reactions to the experience, but also warns that it is unnecessary and potentially misleading to instruct that the expert testimony assumes that a molestation has in fact occurred. (Judicial Counsel of Cal., Crim. Jury Instns. (2021 ed.) Commentary to CALCRIM No. 1193, pp. 946-947.) Many of the post-*Housley* cases challenge the use of CALCRIM No. 1193 on the basis that it reduces the

10

prosecution's burden of proof because it " 'effectively instructs the jury that they may take [the expert's] testimony as evidence of the defendant's guilt.' " (E.g., *People v. Munch* (2020) 52 Cal.App.5th 464, 474.)  These challenges have been routinely rejected. (*Ibid.*)

The appellate court in *Mateo* explained *Housley* was inconsistent with *People v. Humphrey* (1996) 13 Cal.4th 1073, 1088, fn. 5; *id.* at pp. 1090-1091 (conc. opn. of Baxter, J.); *id.* at p. 1100 (conc. opn. of Brown, J.) [a limiting instruction on battered woman syndrome is required only on request].)  (*Mateo, supra*, 243 Cal.App.4th at p. 1073.)  The *Mateo* court reasoned that both syndromes explain that victims' " 'seemingly self-impeaching' " behaviors—e.g., delayed disclosure, returning to the home—are consistent with their claims of having been beaten, raped, or sexually molested and the court could think of no reason why a duty to instruct should be imposed in one situation and not the other.  (*Ibid.*)  We agree.  Because the majority of authority supports the conclusion that there is no sua sponte duty to provide CALCRIM No. 1193 and the instruction is not without controversy, we conclude the trial court did not err in failing to instruct the jury with it.

DISPOSITION

The judgement is affirmed.

_____,
HULL, Acting P. J.

We concur:

_____,
ROBIE, J.

_____,
HORST, J.*

---

*        Judge of the Placer County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.