Filed 7/29/25  P. v. Ronquillo CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DENNIS DABU RONQUILLO,<br><br>    Defendant and Appellant. | H052316<br>(Santa Clara County<br>Super. Ct. No. C2016190) |

A jury convicted defendant Dennis Dabu Ronquillo of 19 sexual crimes against two minor relatives.  The trial court sentenced Ronquillo to 75 years to life consecutive to 50 years in prison.

On appeal, Ronquillo contends the trial court erred by instructing the jury on child sexual abuse accommodation syndrome (CSAAS) with CALCRIM No. 1193 (CALCRIM 1193).  Alternatively, Ronquillo claims that his defense counsel was constitutionally ineffective for failing to object to CALCRIM 1193.

For the reasons explained below, we affirm the judgment.

# I. FACTS AND PROCEDURAL BACKGROUND

A. *Procedural History*

In June 2021, the Santa Clara County District Attorney filed an information charging Ronquillo with 19 sexual crimes involving two minors, Jane Doe 1 and Jane Doe 2.

Counts 1 through 7 of the information alleged crimes committed against Jane Doe 1 at various times between December 1, 2018, and December 2, 2020, namely six counts of a lewd or lascivious act on a child under the age of 14 (Pen. Code,[1] § 288, subd. (a); counts 1–4, 6 & 7) and one count of a lewd or lascivious act by force or duress on a child under the age of 14 (§ 288, subd. (b)(1); count 5).

Counts 8 through 19 alleged crimes committed against Jane Doe 2 at various times between February 27, 2011, and February 26, 2019, namely four counts of oral copulation by force or duress with a minor 14 years old or older (former § 288a, subd. (c)(2)(C) [renumbered as § 287, subd. (c)(2)(C) (Stats. 2018, ch. 423, § 49, eff. Jan. 1, 2019)]; counts 8–11), four counts of a lewd or lascivious act on a child under the age of 14 (§ 288, subd. (a); counts 12–15), two counts of rape by force or duress of a minor 14 years old or older (§ 261, subd. (a)(2); counts 16–17), and two counts of sexual penetration by force or duress on a minor 14 years old or older (§ 289, subd. (a)(1)(C); counts 18–19).

The information further alleged as to each count that Ronquillo committed the charged offenses against more than one victim (§ 667.61, subds. (b), (e), (j)(2)).

In December 2023, the jury found Ronquillo guilty as charged on all counts and found true the multiple victim allegations attached to counts 1

---

[1] All further unspecified statutory references are to the Penal Code.

through 7 and 12 through 15.  The jury, however, found not true those allegations attached to counts 8 through 11 and 16 through 19.

On May 6, 2024, the trial court imposed an aggregate sentence of 75 years to life consecutive to 50 years in prison, comprising 25 years to life on counts 1 through 7 and 12 through 15 (with the terms on counts 1, 5, and 12 imposed consecutively), consecutive lower term sentences of six years on counts 8–11, 18, and 19, and consecutive lower term sentences of seven years on counts 16 and 17.

B. *Evidence Presented at Trial*

1. <u>Prosecution Evidence</u>

The prosecution presented evidence that Ronquillo sexually abused two of his nieces, sisters Jane Doe 1 and Jane Doe 2, while he lived with their family.  Jane Doe 2 is seven years older than Jane Doe 1.  Jane Doe 2 was 22 and Jane Doe 1 was 15 when they testified at Ronquillo's trial in December 2023.

Jane Doe 2 told the jury that when she was in the fourth grade, Ronquillo began entering her bedroom to talk to her.  After a few such interactions, Ronquillo started putting his hand on Jane Doe 2's breast, at first outside of her clothing and, later, underneath her shirt, directly touching her breast.  Ronquillo touched Jane Doe 2 in this manner multiple times when she was in the fourth grade.  Jane Doe 2 was "too scared" to say anything to him.  She, however, did mention some of Ronquillo's abuse to her friends around this time.  She begged them not to say anything because she feared what would happen.

When Jane Doe 2 was in the fifth or sixth grade, Ronquillo began lowering his hand from Jane Doe 2's breast to her vagina and rubbing it

3

outside of her clothing. Jane Doe 2 would freeze up and hope that Ronquillo would stop.

When Jane Doe 2 was in the seventh grade, Ronquillo began to lift her shirt and suck and bite her nipples. This happened on "[n]umerous occasions."

When Jane Doe 2 was in the eighth or ninth grade, Ronquillo placed his hand under Jane Doe 2's pants and tried to insert his fingers inside her vagina, putting his finger between her labia. Between Jane Doe 2's eighth or ninth grade year and when she was 17, Ronquillo digitally penetrated Jane Doe 2's vagina in this way multiple times, testifying it was "too many to count." On rare occasions, Jane Doe 2 told Ronquillo that it hurt her when he bit her nipples or rubbed her clitoris hard. Ronquillo responded, " 'No, it doesn't. You like it, don't you?' "

When Jane Doe 2 was 15 or 16, Ronquillo began touching her breast, fondling her, and then pulling her pants down and rubbing his penis inside her labia. She would pretend to be asleep to discourage him and tried to keep her legs together. Ronquillo attempted to pry her legs apart. This occurred at least five times.

Beginning around when Jane Doe 2 was in the 10th grade, Ronquillo made Jane Doe 2 orally copulate him. Ronquillo touched Jane Doe 2, told her to suck his nipples, pressed her head down toward his penis, and told her to suck it. Jane Doe 2 was scared to say no and she "felt gross." She complied because she feared Ronquillo would get angry, and she thought that if she "just endured it a little more, he wouldn't go after her [sister]." The oral copulation occurred four or five times, until Jane Doe 2 was about 17.

The sexual abuse that Ronquillo perpetrated on Jane Doe 2 made her "very, very depressed." Her grades dropped significantly, which made her

4

mother mad. Jane Doe 2 usually coped with the abuse by "zon[ing] out." She also would "lose track of the time" or sometimes scratch herself. Jane Doe 2 did not warn her sister Jane Doe 1 about Ronquillo because Jane Doe 2 was afraid Jane Doe 1 would tell their mother and arguments and fights would ensue. Jane Doe 2 had arguments with her mother that "turned physical," and there were times her mother wrapped her hands around Jane Doe 2's neck.

In December 2019, Jane Doe 2 told her cousin that Ronquillo had touched her in places she did not want to be touched.[2] Jane Doe 2 begged her cousin not to say anything.

Sometime in 2020, Jane Doe 2 moved out of the family house and into her grandparents' home.

Jane Doe 1 testified that when she was about 10 or 11 years old, Ronquillo touched her on her bare arms and legs while she was sitting on his bed watching a movie. It felt "a little awkward" and "really irritated" Jane Doe 1.

Some weeks later, when Jane Doe 1 hid under the sheets on Ronquillo's bed while playing hide and seek with her brother, Ronquillo slid his hand underneath and touched Jane Doe 1's chest under her shirt. Jane Doe 1 "didn't like it" and "[her] body was telling [her] to . . . get out," but she stayed where she was because her brother had not yet found her. Ronquillo told Jane Doe 1 not to tell anyone what he was doing.

Another time, when Jane Doe 1 was still in elementary school and returning from a party with her family in a van, Ronquillo placed his hands under a blanket, unzipped Jane Doe 1's jeans, put his hand under her

---

[2] Jane Doe 2's cousin provided corroborating testimony about this conversation.

underwear, and rubbed her vagina. Jane Doe 1 was "grossed out," but she was afraid to say anything because she feared that her family would take Ronquillo's side against her.

Later, during the summer between the sixth and seventh grades (when Jane Doe 1 turned 12 years old), Jane Doe 1 was awakened by Ronquillo touching her. His "cold hand" was on Jane Doe 1's vagina over her clothing, and he was trying to rub it. She pushed his hand away and turned over; he left the room.

Another time that summer, Jane Doe 1 was awakened by someone lying down next to her in bed, putting a hand under her shirt, and rubbing her chest area. Jane Doe 1 was not able to see who it was but believed it was Ronquillo.

Once, when Jane Doe 1 was in Ronquillo's bedroom, Ronquillo told her to massage his chest and suck on his nipple. Jane Doe 1 complied because she was told to respect her elders and do as they say. Ronquillo additionally grabbed Jane Doe 1's wrist, moved her hand under his underwear, and told her to grab his penis "and go up and down."

In the beginning of December 2020, while 12-year-old Jane Doe 1 was sleeping on a couch, she felt Ronquillo brushing against her bare, upper arm, towards her chest. She pushed his hand away.

Later that day, Jane Doe 1 told Jane Doe 2 about Ronquillo's abusive conduct because she "felt like it wasn't right anymore" and was "tired of him trying to touch [her] when [she was] sleeping." Jane Doe 1 testified that she disclosed the abuse to Jane Doe 2 first because their mother "is kind of scary" and Jane Doe 1 did not have much interaction with her father. Their parents also were "really strict," and Jane Doe 1 was uncomfortable talking with

them because they "push[ed] [her] away."  She feared they would think she was making up the abuse and she would get in trouble.

After Jane Doe 1 disclosed the abuse to Jane Doe 2, Jane Doe 2 informed their parents about it.  Jane Doe 2 further told their mother about the abuse Ronquillo had perpetrated on her because she feared Jane Doe 1 would not be believed.

Clinical psychologist Dr. Blake Carmichael testified as an expert on CSAAS and the myths and misconceptions surrounding child sexual abuse. Dr. Carmichael did not know the facts of this case and stated that he "would not be able to provide" any opinion on whether someone was sexually abused.

Dr. Carmichael explained that CSAAS is an educational tool that helps people understand myths and misconceptions about child sexual abuse.  He said CSAAS "helps explain why there's such a variety of ways kids react to and tell about their sexual abuse."  Dr. Carmichael added that there is no "checklist to use to determine if someone has been abused" and "CSAAS doesn't tell you if a kid was abused or not."

CSAAS has five components:  secrecy; helplessness; entrapment and accommodation; delayed, unconvincing, and conflicted disclosure; and recanting or retraction.  Dr. Carmichael explained that secrecy refers to the context in which sexual abuse often occurs.  He described reasons why child victims may keep abuse a secret.  Helplessness refers to the "power differential" between the child and the perpetrator.  Entrapment and accommodation pertain to a child's helplessness in stopping the abuse and the ways children cope or deal with the abuse.  Dr. Carmichael described various behavioral, emotional, and cognitive mechanisms that children employ to "manage the situation."  Delayed, unconvincing, and conflicted disclosure encompass belated, inconsistent, and piecemeal revelations.  Dr.

7

Carmichael explained how language, memory, and development may affect disclosure and stated that a child's demeanor with respect to disclosure is "a dynamic situation." Lastly, recantation and retraction refer to the phenomenon in which a child victim discloses a valid claim of sexual abuse and then repudiates it.

On cross-examination, Dr. Carmichael stated that "most people [agree,] and the research agrees that not all kids who have been sexually abused will have each of those [five] components [of CSAAS]. It's really helping understand why those things are not inconsistent for the kid that has been abused."

### 2. Defense Evidence

Ronquillo testified on his own behalf and was the only defense witness. He told the jury that he did not molest Jane Doe 1 or Jane Doe 2 and had "a typical . . . niece relationship" with them. He said he felt "[h]orrible" when hearing their testimony and had no idea how they came up with their allegations. The only reason Ronquillo could think of for their accusations is that they wanted him out of the family's house so their brother could get his bedroom back.

Ronquillo moved in with Jane Doe 1's and Jane Doe 2's family in 2010. From 2010 until 2012, Ronquillo worked for a company that manufactured commercial refrigeration units. From 2012 until 2020, he worked at Tesla on an assembly line. He often worked 12 hours a day, six days a week at Tesla.

In March 2016, Ronquillo sustained an injury that caused him to "hav[e] a hard time" raising his right arm into "a high position" without feeling pain in his shoulder and back. The injury also caused numbness and tingling in his right arm and fingers and a loss of control of his fingers. Additionally, in 2019, Ronquillo developed carpal tunnel syndrome in both

8

hands that required two surgeries. He had a "hard time" driving because he could not "control the steering wheel" due to "pain" and his hands "freez[ing] up" and "tingling." He also "kept dropping" his phone and had a "hard time" writing and brushing his teeth. Given that he did not "have control of [his] right hand," he had a hard time touching his girlfriend intimately, and he could not masturbate.

Ronquillo recalled the time when Jane Doe 1 fell asleep while they were riding in a van. He told the jury that he could not have opened Jane Doe 1's pants due, in part, to his hand problems.

On cross-examination, Ronquillo admitted that until 2020, he used a lighter to light his cigarettes. He testified that he brushed his teeth twice a day, and was able to drive to work, shave and trim his facial hair, and take pictures with his cell phone. He further admitted that he buttoned the shirt, tied the tie, and tied the laces of the shoes he was wearing during his trial testimony.

## II. DISCUSSION

Ronquillo contends that CALCRIM 1193 is legally erroneous because it "instructed the jurors that they could use the expert CSAAS testimony to find that the victims' testimony was true since their conduct 'was consistent with the conduct of someone who has been abused.'" He asserts that the trial court's use of CALCRIM 1193 prejudicially violated his right to due process and a fair trial and lessened the prosecution's burden of proof.

The Attorney General responds that CALCRIM 1193 correctly states the law and there is no reasonable likelihood that Ronquillo's jury misapplied

9

the instruction. The Attorney General further asserts that the instruction did not violate Ronquillo's constitutional rights or prejudice him.[3]

A. *Additional Background*

Pretrial, the prosecutor moved to admit expert testimony regarding CSAAS. The trial court granted the prosecutor's in limine motion and stated that it would instruct the jury with CALCRIM 1193.

In its final instructions, the trial court instructed the jurors as follows: "1193. Testimony on child sexual abuse accommodation syndrome. [¶] You have heard testimony from Blake Carmichael regarding child sexual abuse accommodation syndrome. [¶] Child sexual abuse accommodation syndrome relates to a pattern of behavior that may be present in child sexual abuse cases. Testimony as to the accommodation syndrome is offered only to explain certain behavior of an alleged victim of child sexual abuse. [¶] Blake Carmichael's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not [Jane] Doe's 1 or [Jane] Doe 2's conduct was consistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony." (Boldface & capitalization omitted.)

---

[3] Notwithstanding Ronquillo's failure to object to CALCRIM 1193 at trial, the Attorney General does not assert forfeiture. Moreover, Ronquillo contends that his appellate challenge to CALCRIM 1193 is cognizable because that instruction is legally incorrect and affected his substantial rights. Under these circumstances, we reach the merits of Ronquillo's claim of error. (See *People v. Grandberry* (2019) 35 Cal.App.5th 599, 604; *People v. Gomez* (2018) 6 Cal.5th 243, 312; § 1259.) In turn, we need not consider Ronquillo's alternative ineffective assistance of counsel claim.

B. *Legal Principles*

"While CSAAS evidence is not relevant to prove the alleged sexual abuse occurred," California courts have long held such evidence admissible in child sexual abuse cases to "disabuse jurors of five commonly held 'myths' or misconceptions about child sexual abuse." (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 171 (*Lapenias*).) Such evidence is needed " 'to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' " (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1301; see also *People v. Gonzales* (2017) 16 Cal.App.5th 494, 504 (*Gonzales*) ["The purpose of CSAAS is to understand a child's reactions when they have been abused."]; *People v. Munch* (2020) 52 Cal.App.5th 464, 468 (*Munch*) [" 'The expert is not allowed to give an opinion on whether a witness is telling the truth.' "].)

" 'A claim of instructional error is reviewed de novo. [Citation.] An appellate court reviews the wording of a jury instruction de novo and assesses whether the instruction accurately states the law.' " (*People v. Ramirez* (2023) 98 Cal.App.5th 175, 218 (*Ramirez*).) We consider the challenged instruction " 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' " (*People v. Rivera* (2019) 7 Cal.5th 306, 326; see also *People v. Lemcke* (2021) 11 Cal.5th 644, 655.) We assume that jurors understand and follow the court's instructions. (*People v. Ortiz* (2023) 96 Cal.App.5th 768, 816 (*Ortiz*).)

C. *Analysis*

Relying principally on *People v. Housley* (1992) 6 Cal.App.4th 947 (*Housley*), Ronquillo argues that CALCRIM 1193 is defective because it does not instruct that " 'the expert's testimony is not intended and should not be

used to determine whether the victim's molestation claim is true.' "[4] Ronquillo further argues that the last sentence of the instruction provided to his jury is improper because "CSAAS testimony has been strictly limited to providing evidence that the victim's behavior was *not necessarily inconsistent* with that of an abused child."[5]

We are not persuaded by Ronquillo's contentions that the instruction provided to his jury is erroneous. The trial court instructed the jurors that Dr. Carmichael's testimony about CSAAS was "offered only to explain certain behavior of an alleged victim of child sexual abuse" and "is not evidence that the defendant committed any of the crimes charged against him." In the same vein, Dr. Carmichael testified that there is no "checklist" for

_____

[4] The Court of Appeal in *Housley* concluded that a jury must be instructed that CSAAS evidence "is admissible solely for the purpose of showing the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested; and [] the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true." (*Housley*, *supra*, 6 Cal.App.4th at p. 959; but see *People v. Mateo* (2016) 243 Cal.App.4th 1063, 1074 [disagreeing with *Housley*'s holding that a limiting instruction on CSAAS is required sua sponte and explaining that when "the expert testifies regarding the behavior of abused children as a class, there is little, if any, chance the jury will misunderstand or misapply the evidence"].)

[5] The last sentence of CALCRIM 1193 was modified in September 2022 (before Ronquillo's 2023 trial) to state that CSAAS evidence may be considered by jurors only in deciding whether or not the victim's "*conduct was consistent with* the conduct of someone who has been molested." (CALCRIM 1193 (2023), italics added.) The prior version of CALCRIM 1193 provided: "You may consider this evidence only in deciding whether or not [the victim's] *conduct was not inconsistent with* the conduct of someone who has been molested." (CALCRIM 1193 (2022), italics added.) Ronquillo acknowledges that multiple Courts of Appeal endorsed the prior version of CALCRIM 1193 as accurately informing the jury of the limited use of CSAAS evidence. (See, e.g., *Lapenias*, *supra*, 67 Cal.App.5th at pp. 175–176; *Munch*, *supra*, 52 Cal.App.5th at pp. 473–474; *Gonzales*, *supra*, 16 Cal.App.5th at pp. 503–504.)

determining abuse, "CSAAS doesn't tell you if a kid was abused or not," and he could not opine on whether someone was sexually abused. On this record, we discern no defect in the instant instruction that made it reasonably likely the jurors understood the instruction to permit the use of CSAAS evidence as affirmative proof that Jane Doe 1 and Jane Doe 2 were molested and Ronquillo was guilty. (See *Munch*, *supra*, 52 Cal.App.5th at p. 474; *Ortiz*, *supra*, 96 Cal.App.5th at p. 816; *Ramirez, supra*, 98 Cal.App.5th at pp. 219–220.)

Regarding the last sentence of the instant instruction, we are satisfied that even without the prior version's double negative language about the victim's conduct being "not inconsistent" with that of someone who has been molested, the instant instruction is semantically equivalent to the prior, endorsed version of CALCRIM 1193. The instant instruction retains the original version's "whether or not" phrasing, still permitting the jurors to use the CSAAS evidence only in deciding whether the alleged victims' behavior was either consistent or inconsistent with that of a molestation victim, but not compelling "a conclusion that the victims' conduct was consistent with being a sexual abuse victim." (*Ortiz*, *supra*, 96 Cal.App.5th at p. 816.)

Moreover, Dr. Carmichael stated during his testimony that CSAAS helps people "understand why" the five components it describes "are not inconsistent for the kid that has been abused." Similarly, in his closing argument, the prosecutor stated that the CSAAS evidence was "useful for [] describing that pattern of behavior that might seem kind of counterintuitive but is not otherwise inconsistent with a child who's been molested" and could be used "in evaluating the credibility of [the victims'] testimony." The prosecutor also "reemphasize[d] . . . that this is not like a checklist, that you're not diagnosing anybody with having been abused." Viewed in the

13

context of the complete record, there is no reasonable likelihood the jurors applied the last sentence of the instruction to impermissibly extrapolate from Jane Doe 1's and Jane Doe 2's behaviors that Ronquillo had in fact abused them—rather than to decide only whether their behaviors were self-impeaching.

For these reasons, we conclude the trial court did not err in using CALCRIM 1193 and Ronquillo's constitutional rights were not violated. (See *Ramirez*, *supra*, 98 Cal.App.5th at p. 220; *Ortiz*, *supra*, 96 Cal.App.5th at p. 816.)

Even assuming arguendo that CALCRIM 1193 is erroneous and that error implicated Ronquillo's constitutional rights, we conclude any such error was harmless beyond a reasonable doubt. (See *Chapman v. California* (1967) 386 U.S. 18, 24.) As mentioned *ante*, the trial court expressly instructed that Dr. Carmichael's testimony on CSAAS is not evidence that Ronquillo committed the charged crimes. The court also stated in other instructions that the jurors "alone must judge the credibility or believability of the witnesses" (CALCRIM No. 226) and the jurors were not required to accept an expert's opinion as true or correct. (CALCRIM No. 332.) Additionally, Dr. Carmichael's testimony and the prosecutor's closing argument appropriately conveyed the limitations on the jury's consideration of the CSAAS evidence. Although there was no physical evidence substantiating the sexual abuse described by Jane Doe 1 and Jane Doe 2 and the issue of credibility was paramount, their testimonies were consistent and corroborative of each other, without proof of collusion. In contrast to the compelling evidence of guilt, Ronquillo's testimony was significantly impeached on his principal defense— the effect that his work-related injuries had on his ability to engage in the

14

abusive conduct.  On this record, we are convinced any error in CALCRIM 1193 was harmless beyond a reasonable doubt.

## III.  DISPOSITION

The judgment is affirmed.

_____

Danner, Acting P. J.

WE CONCUR:

_____

Wilson, J.

_____

Bromberg, J.

**H052316**
***People v. Ronquillo***