Filed 9/12/25  P. v. Lopez CA4/2

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO


| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E083694 |
| v. | (Super.Ct.No. RIF2201085) |
| PEDRO OXLAJ LOPEZ, | OPINION |
| Defendant and Appellant. | |


APPEAL from the Superior Court of Riverside County.  Charles J. Koosed, Judge.  Affirmed as modified and with directions.

Aaron J. Schechter, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Melissa Mandel and A. Natasha Cortina, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Pedro Oxlaj Lopez rented rooms from a family for numerous years in several different houses.  While living with the family, he molested Doe1 from the time she was six years old until she was 16 years.  He also molested Doe2, starting when she was six years old.  Defendant was convicted of continuous sexual abuse of a child under the age of 14, three counts of forcible lewd acts on a child under the age of 14, and one count of committing a lewd act on a child under the age of 14.

Defendant claims on appeal (1) the trial court erred and violated his federal due process rights by instructing the jury with CALCRIM No. 1193 regarding Child Sexual Abuse Accommodation Syndrome (CSAAS), as it informed the jury it could consider the CSAAS testimony in evaluating the credibility of the complaining witnesses; (2) remand for resentencing is required in order for the trial court to properly consider a concurrent sentence for his conviction for committing a lewd act on a child under the age of 14; (3) he is entitled to presentence conduct credit pursuant to Penal Code section 2933.1[1]; (4) the abstract of judgment and minute order from sentencing must be corrected to reflect his conviction of violating section 288, subdivision (a), to remove fines that were not imposed at sentencing; and (5) to correct the statement regarding the calculation of victim restitution.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

# FACTUAL AND PROCEDURAL HISTORY

A.    PROCEDURAL HISTORY

Defendant was convicted of one count of continuous sexual abuse of a child under the age of 14, Doe1 (§ 288.5; count 1); three counts of lewd and lascivious acts against a child under the age of 14, Doe2, by force or fear (§ 288, subd. (b)(1); counts 2-4); and one count of committing a lewd and lascivious act on a child under the age of 14, Doe2 (§ 288, subd. (a); count 5).  In addition, the jury found true the special allegations that defendant committed sexual crimes against more than one victim (§ 667.61, subd. (e)(4)) and multiple victims under the age of 14 (§ 667.61, subd. (j)(2)).

Defendant was sentenced to five consecutive 25-years-to-life terms, for a total sentence of 125 years to life.  The trial court awarded 772 days of presentence custody credit and zero days of conduct credit.  Defendant was ordered to pay $432 direct victim restitution to Doe1 pursuant to section 1202.4, subdivision (f), and additional amounts to be determined at a later date.  Defendant was ordered to pay a restitution fine of $300 pursuant to section 1202.4, subdivision (b), but the amount was stayed based on the trial court's finding that defendant did not have the ability to pay fines and fees.  All other fines and fees were suspended based on his inability to pay.

A.    FACTUAL HISTORY

1.    *PROSECUTION CASE-IN-CHIEF*

a.    Incidents Involving Doe1

Doe1 was 24 years old at the time of trial.  She had two sisters, M.C. (age 9), and Doe2, and two brothers, P.C. and G.C.  Doe1 and her family had lived in Riverside at three different houses:  Montgomery Street, Noble Street and Merrill Street houses.

Doe1 was six or seven years old when her family lived in the Montgomery Street house.  Several people lived in the house including herself, her father, her mother (I.C.), little brother, G.C., a family friend and another roommate.  When the family moved to the Noble Street house, when she was 10 or 11 years old, all she, Doe2, P.C. and G.C. shared a room.  Also in the house were her parents, a cousin and two roommates.  They lived in the Noble Street house for three or four years.  Doe1's parents did not speak English and Doe1 oftentimes translated for them with the roommates who were living with them, including issues regarding rent.  When she was approximately 13 years old, they moved to the Merrill Street house.  She lived in that house from 2013 until 2019.  She, Doe2, PC, G.C., her parents and two roommates lived in the house.

While living in the Montgomery Street house, one of the roommates, later identified as defendant, would grab her and say that he wanted to kiss her when they walked past each other in the hallway of the house.  One night, when she was seven years old, she fell asleep on the couch in the living room.  She felt someone kiss her, and when she woke up, defendant was walking away from her.  She asked him if he had kissed her,

4

and he said yes. She told him to never do it again, but he responded that he wanted to kiss her again.

Doe1 recalled that defendant grabbed her and told her he wanted to kiss her over 30 times while they were living in the Montgomery Street house. She tried to get him to stop. One time, he told her that when she was older, "I'm definitely going to fuck you." This made her very uncomfortable. She tried to avoid being alone with defendant. She never told anyone in the house what defendant was doing because she did not want to cause "chaos" in the house.

When Doe1 and her family moved to the Noble Street house, defendant moved with them. She, Doe2, P.C., and G.C. were living in the Noble Street House, along with her parents, a cousin, defendant and another roommate. While in the Noble Street house, defendant would walk by her in the hallway, and when no one else was around, he would grab her and try to kiss her. He pushed her up against the wall and held her. She had a hard time getting away from him. He told her he wanted her in his bed. He also hugged her tight to his body. She always told him no. He made her uncomfortable and she did not like him. He was successful in kissing her on the cheek. These incidents occurred four or five times each week during the several years they lived in the Noble Street house.

Doe1 stated she was "forced" to be in a relationship with defendant by her brother, P.C., when she was 10 or 11 years old. P.C. told her that if she did not agree to be with defendant, defendant would move out and their mother would be stressed about how to pay rent. Doe1 agreed so that her mother would not be stressed about money and

5

because she did not want P.C. to be upset with her. Defendant asked her one time while they were in the hallway if she would be his girlfriend and she agreed.

Defendant would send her texts that she needed to come to his bedroom after her parents went to sleep. When she got into defendant's bedroom, he would lock the door. She would have to sit on his bed. He would try to hug and kiss her. One time he told her to get on top of him, and he moved her body against his. Doe1 could feel his penis when he rubbed against her, which was hard, and she felt very uncomfortable. He would move his penis back and forth against her vagina while they both had clothes on. On several occasions, she found "white stuff" on the clothes she was wearing. Doe1 went to defendant's bedroom approximately 50 times while they were at the Noble Street house. Doe1 was ashamed and disgusted by what she was doing, but felt she had no choice in order to help her family financially.

Other times in defendant's bedroom, defendant would try to touch her "boobs" and vagina. He also would grab her hand and put it on his penis and she would pull her hand away. On one occasion, he kept her hand there and moved it back and forth. He was wearing boxers, so she touched him over his clothes. Defendant kissed her on the mouth several times while they were in his bedroom.

At one point, Doe1 showed P.C. the "white stuff" on her shorts and told P.C. that she thought it was wrong that defendant was having her get on top of him. P.C. responded that she was making up that defendant was making her get on top of him. His response made Doe1 feel defeated and she thought that no one would believe her if she disclosed the abuse. Doe1 at one point tried to tell her mother, while they were in the

6

Noble Street house, that defendant had tried to touch her in the hallway. Her mother disregarded it, telling her it was Doe1's fault for giving "him eyes so that is why he is going to do that."

At the end of eighth grade, they moved into the Merrill Street house. Defendant moved with them. Defendant paid rent and the family's finances were still tight. She continued to be with defendant because she did not want him to move out, leaving the family unable to afford their house. While in the Merrill Street house, she was forced to go to defendant's room at night. He would kiss her, touch her, and make her get on top of him. He would rub his crotch against her crotch. He made her move back and forth, and she felt like she had no choice but to obey. She did not recall having any white stuff on her while at the Merrill Street house. One time, while on top of her, defendant kissed her belly and tried to go lower but she closed her legs and pushed him away. Defendant continued to touch her breasts and vagina over her clothes while they were in the Merrill Street house.

Defendant continued to touch her while they were at the Merrill Street house until she turned 16 years old. Doe1 tried to overdose, and when she woke up, she told her brother she could not be with defendant anymore. She told defendant she would no longer go to his room. Doe1 still felt that she could not tell her parents, even though the abuse had stopped. One year after she told defendant to stop touching her, she told her mother what had been happening. Her mother did not say much about it and Doe1 felt that since it was over, it did not matter. When she was 19 years old, she moved out of the Merrill Street house and moved in with her girlfriend.

Doe1 still had nightmares about what defendant did to her. In February 2022, she posted about the molestation on social media. At the time, defendant was still living with her parents. She then called law enforcement. In 2021, Doe2 disclosed to her that when Doe2 was 14 or 15 years old, defendant had also molested her. Doe2 was ashamed and terrified when telling Doe1. It pushed Doe1 to tell what had happened to her.

### b. Incidents Involving Doe2

Doe2 was 17 years old at the time of trial and was a senior in high school. She had lived in the Merrill Street house since she was six years old. She currently lived with G.C., M.C., and their parents. Defendant lived with them in both the Noble and Merrill Street houses. He had his own room in both houses and paid rent. She recalled that sometimes defendant would take care of her and her siblings when their parents would leave the house. He was an adult while they were living in the Noble Street house.

When Doe2 was six years old, and they were living in the Noble Street house, defendant grabbed Doe2's hand and forced her to put it under his pants and touch his penis. They were in his bedroom with the door locked. He got her into his bedroom by telling her he had a toy for her. She could not recall whether he moved her hand, but she thought that he did. The incident lasted for about 20 minutes. When she left his room, he told her not to tell her parents. This happened more than twice. She did not feel she could fight against defendant because he was much taller and stronger than her.

Doe2 also recalled that one time in the Merrill Street house, defendant slapped her on the "butt" and G.C. saw it happen. G.C. tried to tell their mother about defendant touching her bottom, but she said not to tell their father because he would be mad and kick defendant out. They needed defendant to pay rent.

Doe2 finally told Doe1 what defendant did to her in 2021. In response, Doe1 told Doe2 that it had also happened to her. In February 2022, Doe2 finally spoke with law enforcement. She also wrote about what happened to her in a journal in March 2022.

On March 12, 2022, Doe2 was interviewed by Jacklyn Saldana, who was a trained forensic interviewer of children who had been sexually abused. Doe2 told Saldana that when she put her hands down defendant's pants, his penis felt hard and hairy. Sometimes after these incidents, defendant would give her money. This happened more than twice while they were in the Noble Street house. She also recalled that one time while in the Merrill Street house, he made her sit on top of him. They both had on their clothes. She would feel his penis in her crotch area. She indicated that he was "dry humping" her, which she explained was that he rubbed his penis against her. She heard him moaning.

She told Saldana that defendant also made her touch his penis in his room at least once while they were living at the Merrill Street house. He moved her hand against his penis. Defendant also tried to touch her vagina over her clothes one time while they were in his bedroom, but she closed her legs so he could not touch her. She believed she was seven years old at that time. During one of the incidents, defendant asked her whether Doe1 had a boyfriend.

9

c.    Investigation

Riverside Police Sergeant Reid was assigned to the sexual assault and child abuse unit. He spoke with Doe1 on several occasions and she was very emotional. He also spoke with Doe2, who was also very emotional and had a hard time talking about what had happened to her. Based on defendant's driver's license, he was 13 years older than Doe1 and 20 years older than Doe2.

Riverside Police Officer Olivares spoke with Doe1 on February 22, 2022. Doe1 was nervous and would sometimes freeze when giving her statements. She was sitting in a fetal position, withdrawn within herself during the interview. Officer Olivares spoke with I.C., who had no reaction to being told that they were there to investigate accusations by Doe1 against defendant.

Riverside Police Officer Murphy went to the Merrill Street house on February 22, 2022. He spoke with Doe2, who was 15 years old at the time. Doe2 was upset while speaking with Officer Murphy. She seemed sad and did not want to talk about what had happened to her.

Heidi Pietron started dating Doe1 in 2018 and ended their relationship in 2022. They lived together starting in 2019. Doe1 told her about defendant after they had been dating for about one year. Doe1 was afraid to talk about it because no one had ever believed her. She was emotional and crying when talking about it. Doe1 told Heidi that defendant lived with her family. He started touching her when she was seven years old, and made her be in a relationship with him when she was 13 years old. Doe1's brother had told her that if she did not agree to be in a relationship with defendant, the family

10

would not be able to afford rent for the house. Doe1 told Heidi that defendant touched her butt, her breasts and would kiss her. When Doe1 and Heidi went to her parents' house, Doe1 would avoid being in the same room with defendant. Heidi encouraged Doe1 to call the police and report what had happened to her. Doe1 posted about it on social media and then contacted law enforcement.

P.C. was granted immunity to testify. He was 28 years old at the time of trial. He moved out of the Merrill Street house when he was 22 years old; he lived there from 2013 until 2018. He lived in the Noble Street house for two years. He was friends with defendant, who lived with them in both houses. He noted that his family struggled financially and had to rent out rooms to survive. In the Noble Street house, all the siblings shared a room and it had a window.

When Doe1 was about 10 years old, she told P.C., who was 14 years old at the time, that defendant made her be his girlfriend and she did not want to be his girlfriend. Defendant told P.C. that if Doe1 ended things with him, he would move out and their parents would not be able to afford their house. P.C. told Doe1 he would help her keep it from their parents. He helped her by making sure that her parents were asleep when she went to defendant's room. He recalled one night in the Noble Street house that Doe1 went to defendant's bedroom. Doe1 told P.C. that she did not want to go to his bedroom and she looked sad. P.C. told her not to go. She said she had to go, or defendant would be upset and leave. She was concerned her parents would not be able to pay for the house if he left. P.C. agreed with her. Doe1 returned 20 minutes later and appeared sad. She told him that defendant had her touch his private part with her hand.

11

P.C. indicated that defendant sent him messages almost every day while they were in the Noble Street house to tell Doe1 to come to see him in his bedroom. P.C. would just respond, "Okay." P.C. would tell Doe1 about the messages. If P.C. did not tell Doe1, defendant would call him or come to their bedroom window. After being with defendant, Doe1 would sometimes tell P.C. that defendant had tried to kiss her and put her hand on his private parts.

P.C. did not recall anything from the Merrill Street house except that defendant continued to send him messages to have Doe1 go to his bedroom. Defendant told P.C. that he was in love with Doe1 starting when she was 10 years old. When P.C. was 15 years old, defendant told him that some day he would get to have a sexual relationship with Doe1, and P.C. responded that she was too young. Defendant responded, "one of these days."

When Doe1 was 16 years old, she told P.C. she was no longer going to be with defendant. She seemed happy. Defendant told P.C. that he should encourage Doe1 to get back with him and threatened to leave the house. P.C. had lied to investigators prior to the trial, claiming he knew nothing about what was happening to Doe1. He was scared he was going to get in trouble because he knew what happened to Doe1 and did not tell anyone. He was being truthful at trial.

12

G.C. was 19 years old at the time of trial. He still lived with his parents at the Merrill Street house. He recalled living in the Noble Street house with Doe2 and Doe1. Defendant also lived in the house. G.C. shared a room at the Noble Street house with his siblings. He indicated that his family had to rent out rooms for financial reasons. He recalled that both his parents worked while they lived in the Noble Street house and defendant would sometimes "watch" the kids while their parents were at work. He recalled being in his bedroom one night in the Noble Street house and defendant came to the window.[2]

G.C. was 10 years old when they moved into the Merrill Street house. Defendant moved with them and had his own room. G.C. shared a room with Doe2 and Doe1. He witnessed defendant grab Doe2's "behind" with his hands. G.C. described it as "groping her." He saw Doe2 "flinch" when defendant grabbed her. G.C. and Doe2 told their mother, but she did not believe them and told them not to tell their father.

d. CSAAS Testimony

Dr. Jody Ward was a clinical and forensic psychologist specializing in the sexual abuse of children. She had testified in court over 400 times as an expert on how children respond to sexual abuse. She did not know the details of the instant case. She explained that CSAAS was a pattern of behaviors that many children exhibit who have been sexually abused in an ongoing relationship.

---

[2] P.C. confirmed that defendant was at the window, but lied to G.C. that no one was there; P.C. did not want G.C. to find out about what defendant was doing to Doe1 and tell their parents.

Children who were abused in an ongoing relationship responded differently from other sexual abuse victims. A person who has been molested by a stranger usually immediately reported the abuse and were believed by others. Many times, those who are abused in an ongoing relationship do not report the abuse out of love and loyalty toward the abuser. Further, when they report the abuse, many times they are not believed.

Dr. Ward explained that CSAAS had five components, including secrecy, helplessness, entrapment and accommodation, delayed unconvincing disclosure, and retraction or recantation. Secrecy included that the sexual abuse took place while other persons were not present and also that the children kept the secret of sexual abuse for very long periods of time. Many children kept the secret because it was embarrassing, or they were concerned it would disrupt their family life. Helplessness referred to the power imbalance between adults and children, and that a child was dependent on adults. A child who was living with the abuser would feel even more helplessness. This helped explain why children tended to report abuse later in life when they were not dependent upon living with their abuser.

Entrapment and accommodation were based on children not immediately reporting the abuse, which tended to lead to more abuse. The child may become entrapped in the situation and learn to accommodate the abuse. Although a person on the outside may think they would immediately report the abuse or try to get out of the situation, this was not how a child who was helpless would necessarily react. The child wanted to keep her family together and was willing to suffer the sexual abuse to keep her family together.

14

As for delayed or unconvincing disclosure, a majority of children wait until they are adults to disclose the abuse. When a person finally makes a disclosure, they do not always report all of the details at one time. If the child feels like they are being believed, he or she will be more comfortable to disclose more details. A child also may tell their peers about the abuse to relieve themselves of the burden of it, but does not want it disclosed to law enforcement. Dr. Ward admitted there was no litmus test or diagnostic tool that could be used to be sure if a child was being truthful about the sexual abuse.

### 2. *DEFENSE*

At the time of trial, I.C. still lived in the Merrill Street house. She insisted that prior to law enforcement coming to the Merrill Street house on February 2, 2022, she had no knowledge of defendant abusing Doe1. She admitted that about one month prior to the police coming to the Merrill Street house, Doe2 and G.C. had told her that defendant had touched Doe2's buttocks. She did not believe them. She told them not to tell their father. She asked defendant and he said it was a lie. I.C. admitted that they needed defendant's rent to pay their bills and for the house.

## DISCUSSION

### A. CALCRIM NO. 1193

Defendant contends the trial court erred and violated his federal constitutional due process rights and right to a fair trial by instructing the jury with CALCRIM No. 1193. The jury should not have been instructed that the CSAAS testimony could be used to evaluate the veracity of the witnesses.

15

1.    *ADDITIONAL FACTUAL HISTORY*

The parties discussed the jury instructions off the record with the trial court.  On the record, defendant had no objections to the instructions, including the giving of CALCRIM No. 1193.  The jury was instructed with CALCRIM No. 1193 as follows: "You have heard testimony from Dr. Jodi Ward regarding [CSAAS].  Dr. Jodi Ward's testimony about [CSAAS] is not evidence that the defendant committed any of the crimes against him.  [CSAAS] research is based upon an approach that is completely different from that which you must take in this case. . . .  The syndrome research begins with the assumption that a molestation has occurred and seeks to describe and explain common reactions of children to that experience.  As distinguished from that research approach, you are to presume the defendant innocent.  The People have the burden of proving guilt beyond a reasonable doubt.  You may consider this evidence only in deciding whether [Doe1] and/or [Doe2]s conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony."

2.    *FORFEITURE*

Defendant did not object to the standard CALCRIM No. 1193 instruction in the trial court.  The People insist that by failing to object, he forfeited the claim on appeal.  Defendant contends this court should nonetheless consider his claim since it involves a pure question of law and his substantial rights were violated.  "Generally speaking, a 'failure to object does not waive an instructional error on appeal if the instruction was an incorrect statement of law or the defendant's substantial rights were affected.' " (*People v. Grandberry* (2019) 35 Cal.App.5th 599, 604.)  However, several other courts have

16

reviewed instructional error claims when there was a claim of a violation of substantial rights or that the instruction was an incorrect statement of the law despite the failure to object in the trial court. (See *People v. Gomez* (2018) 6 Cal.5th 243, 312; *People v. Ortiz* (2023) 96 Cal.App.5th 768, 815, fn. 23 (*Ortiz*); *Grandberry*, at p. 604.) We will review defendant's claim to determine if his substantial rights were affected by the instruction or if it was an incorrect statement of law.

" 'We review a claim of instructional error de novo. [Citation.] The challenged instruction is considered "in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner." ' " (*Ortiz*, *supra*, 96 Cal.App.5th at pp. 815-816.)

Numerous courts have rejected defendant's same argument that CALCRIM No. 1193 improperly informs the jury that they can consider CSAAS testimony in appraising the credibility of the victim and that it dilutes the People's burden of proof. (See *People v. Lapenias* (2021) 67 Cal.App.5th 162, 175-176 ["CSAAS evidence 'is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation' "]; *People v. Gonzales* (2017) 16 Cal.App.5th 494, 503-504; *People v. Munch* (2020) 52 Cal.App.5th 464, 473-474.) Defendant insists these cases were wrongly decided.

In *Ortiz, supra*, 96 Cal.App.5th 768, the defendant contended, as defendant does here, that "the trial court erred when it instructed with CALCRIM 1193 because the instruction allowed the jurors to use the CSAAS evidence to evaluate the complaining witnesses' credibility in a manner that exceeds the permissible usage, thereby lessening the prosecution's burden of proving his guilt beyond a reasonable doubt and violating his due process rights." (*Id.* at p. 815.) The appellate court found that there was not "a reasonable likelihood the jurors here applied the instruction in an impermissible manner." It focused on the fact that the instruction advised the jurors that the CSAAS testimony "could not be considered as evidence that" the defendant "committed any of the crimes charged against him or any conduct or crimes with which he was not charged. Thus, the instruction explicitly precluded the use of that testimony to conclude inferentially from the victims' conduct" and the CSAAS testimony that the defendant "committed the charged or uncharged crimes." (*Id.* at p. 816.) In addition, it found that the last sentence of the instruction—you may consider this evidence only in deciding whether the victim's conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony—did not compel a conclusion that the victim's conduct was consistent with being a sexual abuse victim. (*Id.* at p. 816.) The court concluded that the trial court properly instructed the jury with CALCRIM No. 1193 and that the defendant's constitutional rights were not violated by the instruction. (*Ibid*.)

We see no reason to depart from these cases. The jury was specifically instructed that it could not consider the CSAAS testimony as proof that defendant sexually abused Doe1 and Doe2. Further, Dr. Ward testified that a child's behavior after disclosing the abuse should not be used to determine whether or not sexual abuse has occurred because children respond in many different ways. Dr. Ward also stated that there was no litmus test or diagnostic tool that could be used to be sure one way or another if a child was being truthful about the sexual abuse. Based on the language of the instruction and the testimony of Dr. Ward, the trial court properly instructed the jury with CALCRIM No. 1193 and defendant's constitutional rights were not violated by the instruction.

Defendant relies on *People v. Housley* (1992) 6 Cal.App.4th 947 and *People v. Bowker* (1988) 203 Cal.App.3d 385, to support his claim that the jury was improperly instructed with CALCRIM No. 1193. These cases were decided prior to the drafting of CALCRIM No. 1193 in 2006. They addressed whether some type of limiting instruction should be given when CSAAS testimony is admitted at trial to clarify that the CSAAS testimony should not be used to determine whether the victim's molestation claim is true, but did not evaluate whether CALCRIM No. 1193 is a proper instruction. (*Housley*, at pp. 956-959; *Bowker*, at p. 394.) *Gonzalez*, *Ortiz* and the other cases specifically considered the language of CALCRIM No. 1193 and we follow their conclusions in this case.

The trial court properly instructed the jury with CALCRIM No. 1193. It did not lessen the burden of proof or improperly inform the jury. We reject defendant's claim of instructional error.

19

B.    RESENTENCING ON COUNT 5

Defendant contends the trial court did not "appreciate its discretion" to impose a concurrent term on count 5.  He insists that neither section 667.6 nor 667.61 mandate a consecutive sentence for a violation of section 288, subdivision (a), and that remand is necessary for the trial court to consider a concurrent sentence on count 5.  The People respond that the trial court was aware of its discretion to impose a concurrent sentence on count 5, and stated on the record the factors in favor and against a consecutive sentence on count 5.  Moreover, any conceivable error was harmless.

1.    *ADDITIONAL FACTUAL HISTORY*

In the People's sentencing brief, the People argued that defendant warranted a sentence of five consecutive 25-year-to-life terms for a total of 125 years to life.  The People noted that pursuant to section 667.61, subdivisions (b), (d), and subdivision (j)(2), except as provided in subdivision (j), defendant should receive a 25 years to life in prison consecutive sentence for qualifying offenses upon a victim under the age of 14.  In his sentencing brief, defendant requested that the fines and fees be stayed since he did not have the ability to pay, but did not discuss imposing a concurrent term on count 5.

In the probation report, the probation department improperly listed count 5 as a violation of section 288, subdivision (b)(1).  It also provided, "Pursuant to Penal Code Section 667.61(j)(2), any person who is convicted of Penal Code section 288(b) against a child under 14 years by force, and the offense is committed against more than one victim, shall be punished by 25 years to life in state prison for each count, for a total of 100 years to life."

20

At sentencing, the trial court noted that it had reviewed sections 667.61, subdivision (c)(9) (continuous sexual abuse of a child under section 288.5) and 667.61, subdivision (j)(2) (for victims under the age of 14 a 25-years-to-life sentence is proper), and that because there were multiple victims under the age of 14, the appropriate sentence on count 1 was 25 years to life. Defendant submitted on the statement. The trial court stated that defendant's actions and conduct required it give the maximum sentence. The trial court noted that it was aware of only two mitigating factors, which were that defendant had no prior record and was under the age of 26 when the crimes occurred. This was weighed against the aggravating factors of vulnerability of the victims, and planning and sophistication. "All of those weigh heavily against any type of leniency or lesser sentence than what's called for by the Penal Code." The trial court found that none of the counts were subject to section 654; all acts occurred at different times and involved different victims.

The trial court then pronounced the sentence of 25 years to life on all five counts and they were ordered to run consecutive to each other.

2. *ANALYSIS*

" 'Defendants are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court. [Citation.] A court which is unaware of the scope of its discretionary powers can no more exercise that "informed discretion" than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record.' [Citation.] In such circumstances, we have held that the appropriate remedy is to remand for resentencing unless the record 'clearly

21

indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.)

Section 667.61 is known as the "One Strike" law. (*People v. Mancebo* (2002) 27 Cal.4th 735, 738.) Section 667.61, subdivision (a) provides "[A] person who is convicted of an offense specified in subdivision (c) under one or more of the circumstances specified in subdivision (d) or under two or more of the circumstances specified in subdivision (e) shall be punished by imprisonment in the state prison for 25 years to life." Section 667.61, subdivision (c)(4) lists section 288, subdivision (a), as a qualifying crime. Section 667.61, subdivision (j)(2) provides, "A person who is convicted of an offense specified in subdivision (c) under one of the circumstances specified in subdivision (e), upon a victim who is a child under 14 years of age, shall be punished by imprisonment in the state prison for 25 years to life." Section 667.61, subdivision (e)(4) provides "the defendant has been convicted in the present case or cases of committing an offense specified in subdivision (c) against more than one victim." As such, defendant was subject to a 25-years-to-life sentence on count 5 based on committing qualifying offenses against multiple victims under the age of 14.

Section 667.6, subdivision (d)(1) provides, "A full, separate, and consecutive term shall be imposed for each violation of an offense specified in subdivision (e) if the crimes involve separate victims or involve the same victim on separate occasions." Section 288, subdivision (a), is not listed in section 667.6, subdivision (e). As such, the trial court did have the discretion to impose a concurrent sentence of 25 years to life on count 5.

Here, we need not address whether the trial court was aware of its discretion to impose a concurrent sentence on count 5. Even if the trial court was unaware of its discretion, the record "clearly indicate[s]" that the trial court would have reached the same conclusion. (*People v. Gutierrez*, *supra*, 58 Cal.4th at p. 1391.) The trial court stated that defendant's actions and conduct required a maximum sentence. The trial court stated that defendant had manipulated Doe1 and Doe2 over several years, and also manipulated P.C. The trial court, after considering both the mitigating and aggravating factors, found that they weighed heavily against leniency or a lesser sentence. The record clearly indicates the trial court would not have imposed a concurrent sentence on count 5.

C.    CONDUCT CREDITS

Defendant insists he is entitled to conduct credits pursuant to section 2933.1. Defendant contends that section 667.61 does not render him ineligible for conduct credits. He is entitled to 115 days of conduct credits, and this court can modify the judgment to reflect presentence custody credits of 887 total days, including 772 days of actual credit and 115 days of conduct credit. The People insist that section 667.61 does not allow for conduct credit for One Strike cases.

The probation report provided that defendant was only entitled to 772 days of credit for local time, and was not entitled to any conduct credits. At the time of sentencing, the trial court noted that he had "772 days of actual time—you don't qualify for any good time credit—for a total of 772 days of credit." There was no objection by defense counsel.

23

In *People v. Adams* (2018) 28 Cal.App.5th 170, the court found that section 667.61 does not allow for conduct credits pursuant to sections 2933.1 or 4019. It held, "Section 667.61 was amended in 2006 . . . to eliminate the existing section 667.61, subdivision (j) and any reference to presentence conduct credits. [Citation.] It is uncertain on its face whether the amendment was intended to eliminate presentence conduct credit for defendants sentenced under section 667.61, or to authorize full conduct credit under section 4019. We turn, therefore, to the legislative history. Committee reports evidence the Legislature's intent to eliminate conduct credit for defendants sentenced under section 667.61, the so-called 'One-Strike Law.' The Senate Committee on Public Safety's analysis of Senate Bill No. 1128 (2005-2006 Reg. Sess.) unambiguously states: 'Elimination of Sentencing Credits for One-Strike Inmates [¶] Existing law provides that a defendant sentenced to a term of imprisonment of either 15 years to life or 25 years to life under the provisions of the "one-strike" sentencing scheme shall not have his or her sentence reduced by more than 15% by good-time/work-time credits. [Citation.] [¶] This bill eliminates conduct/work credits for inmates sentenced under the one-strike law.' [Citations.] Now there are no conduct credits allowed against the minimum term." ' " (*Id.* at p. 182.) Several courts have followed the reasoning in *Adams*. (See *People v. Govan* (2023) 91 Cal.App.5th 1015, 1036-1037 ["[W]e agree with our colleagues in . . . *Adams* that one strike offenders sentenced to indeterminate terms under section 667.61 are not entitled to any presentence conduct credit"]; *People v. Dearborne* (2019) 34 Cal.App.5th 250, 267-268.) We also agree with the findings in *Adams*.

24

Defendant argues that section 667.61 does not mention conduct credits. However, the court in *Adams*, *supra*, properly determined that such elimination of conduct credits by the Legislature from section 667.61 evidenced that no conduct credits should be awarded to a person sentenced to an indeterminate term pursuant to section 667.61. The trial court properly denied conduct credits to defendant.

D.      <u>ABSTRACT OF JUDGMENT</u>

Defendant contends the abstract of judgment and minute order must be corrected because they improperly state that the conviction in count 5 was a violation of section 288, subdivision (b)(1), but he was convicted pursuant to section 288, subdivision (a). In addition, defendant contends that the abstract of judgment should be modified to strike the $300 restitution fine pursuant to Penal Code section 1202.4, subdivision (b), the $200 court operations assessment pursuant to Penal Code section 1465.8, and the $150 criminal conviction assessment pursuant to Government Code section 70373, as they were not imposed during the trial court's oral pronouncement of sentence. The trial court stayed and suspended all fines and fees. Finally, the abstract of judgment in section 12 should be corrected to strike the language regarding victim restitution as follows: "and addtl amounts determined by Probation" (boldface omitted) as it improperly delegates the calculation of any additional victim restitution to the probation department.

The People agree that the abstract of judgment and minute order should be corrected to reflect the proper conviction on count 5. As for the fines and fees, the People insist that they should be reflected on the abstract of judgment as stayed. The People do not provide a response as to the striking of the language in section 12.

25

"Where there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls." (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385.) The appellate court had authority to correct such clerical errors. (*Ibid*; see also *People v. Rowland* (1988) 206 Cal.App.3d 119, 123.)

The abstract of judgment states that defendant was convicted of a violation of section 288, subdivision (b)(1), on count 5, when in fact he was convicted of a violation of section 288, subdivision (a). We will order that the minute order from sentencing and the abstract of judgment be corrected to reflect that defendant was convicted of a violation of section 288, subdivision (a) in count 5.

Defendant insists that the minute order reflects that the fines and fees were stayed, and there was no need to include them on the abstract of judgment because they were not financial obligations. "All fines and fees must be set forth in the abstract of judgment." (*People v. High* (2004) 119 Cal.App.4th 1192, 1200.) "If the abstract does not specify the amount of each fine, the Department of Corrections cannot fulfill its statutory duty to collect and forward deductions from prisoner wages to the appropriate agency." (*Ibid*.)

At sentencing, the trial court ordered, "I'll reduce the restitution fine to $300 and stay it. Parole revocation fine will also be $300. That will be suspended unless parole is revoked. I will stay and suspend all other fines and fees pursuant to an inability to pay."[3]

---

[3] We note the People do not make any argument that the trial court did not have the authority to stay the section 1202.4, subdivision (b), restitution fine and we will not address the issue.

The trial court never imposed an amount on the court security fee or the criminal conviction assessment. "The clerk cannot supplement the judgment the court actually pronounced by adding a provision to the minute order and the abstract of judgment." (*People v. Zackery, supra*, 147 Cal.App.4th at pp. 387-388.) Those amounts should be stricken from the abstract of judgment. The abstract of judgment should reflect that the $300 restitution fine was ordered in section 9, but also should reflect that it was stayed by the trial court under section 12. Defendant has provided no authority to support that a restitution fine imposed pursuant to section 1202.4, subdivision (b), but stayed, should not be reflected on the abstract of judgment and we have found none. We will order the correction to the abstract of judgment.

At the time of sentencing, the trial court inquired if the People were asking for victim restitution to be decided at a later date. The prosecutor responded that for Doe1, they were requesting $432, and the "rest to be determined in case other restitution costs arise." The trial court ruled, "The Court will order victim restitution in the amount of $432 to [Doe1]. Any other further victim restitution is to be determined by probation." The trial court also found that defendant was entitled to a hearing to contest any amount. On the abstract of judgment, under "Other Orders" in section 12, it states, "As to [Doe1]: [¶] Pay $432 for Victim restitution [victim] and addtl amounts determined by Probation (1202.4(f)(PC)." Under "Restitution Orders" it is reflected that any disputes as to amount to be resolved at a court hearing.

The People do not dispute that the language "addtl amounts determined by Probation (1202.4(f)(PC)" should be stricken from the abstract of judgment. As such, we

27

will order that the language be stricken from the abstract of judgment. However, the trial court did order that additional restitution to the victim may be awarded. The abstract of judgment should properly reflect such order under "ADDITIONAL VICTIM RESTITUTION ORDERS." It should be corrected to check the box and state as follows, "Pay $432 for restitution [victim] and additional amounts to be determine by Probation (1202.4(f) PC; Division of Adult Institutions to collect obligation (2085.5); . . ." In addition, the box should be checked that states, "Any disputes as to amounts to be resolved in court hearing. Enhanced Collection Division to forward findings to Division of Adult Institutions." We shall so order the corrections to the abstract of judgment.

## DISPOSITION

The trial court shall modify the abstract of judgment to reflect that defendant was convicted of a violation of Penal Code section 288, subdivision (a), in count 5. In addition, the trial court shall strike the fees reflected on the abstract of judgment pursuant to Penal Code section 1465.8 and the Government Code section 70373 fee. In addition, the abstract of judgment shall be amended by adding that the Penal Code section 1202.4, subdivision (b) restitution fine in the amount of $300 was stayed in section 12 "Other orders." It shall also strike the following language from the abstract of judgment in section 12: "and addtl amounts determined by Probation." The abstract of judgment should also be corrected under "ADDITIONAL VICTIM RESTITUTION ORDERS" to check the box and state as follows, "Pay $432 restitution [victim] and additional amounts to be determined by Probation (1202.4(f) PC; Division of Adult Institutions to collect obligation (2085.5 PC)." In addition, the box should be checked that states, "Any

28

disputes as to amounts to be resolved in court hearing.  Enhanced Collection Division to forward findings to Division of Adult Institutions."  The trial court shall send a certified copy of the amended abstract of judgment to the California Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
Acting P. J.

We concur:

CODRINGTON
J.

RAPHAEL
J.